Wendell L. STEPHENS, Sr., Plaintiff-Appellant,

v.

Margaret HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 84–1994.

United States Court of Appeals, Seventh Circuit.

Submitted May 16, 1985.*

Decided June 21, 1985.

Flaum, Circuit Judge, concurred and filed opinion.

---

* After a preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful in this case. The notice invited either party to file a "Statement as to Need or Oral Argument." Fed.R.App.P. 34(a); Circuit Rule 14(f). No such statement was filed, and the appeal has been submitted on the briefs and record.

Dennis K. Frick, East Central Legal Services Program, Inc., Anderson, Ind., for plaintiff-appellant.

Jeffrey M. Teske, Dept. of Health & Human Services, Chicago, Ill., for defendant-appellee.

Before ESCHBACH, FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

A person who suffers an injury on the job usually gets compensation according to the extent of the loss. If the injury forces the person to move to a less demanding but less remunerative job, either the workers' compensation system or the tort system will afford relief. The greater the reduction in income, the greater the compensation. A person who loses 30% of his earnings potential will be rated 30% disabled under workers' compensation or recover a tort judgment equal to the present value of 30% of his future earnings. This reflects the fact that the loss from injury is a matter of degree.

Not so with the system of disability insurance under the Social Security Act, 42 U.S.C. § 423. A person is "disabled" or not; there are no degrees. And a person is not disabled unless he is "not only unable to do his previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). A person with a partial disability for purposes of workers' compensation is "not disabled" under the Social Security Act, and even a person entitled to collect substantial damages because he cannot find any employment may be deemed "not disabled."

I

Wendell L. Stephens, Sr., was injured on the job in 1972. While lifting a heavy load he felt his left hip pop. For the next six years he worked on and off. He would work for as much as seven months at his job as an attendant in a warehouse, then take time off to rest his back. He experienced pain and visited hospitals. He received workers' compensation benefits covering up to 50% of his average wage, and he may have had a rated disability of 15%. (The record is not clear on the rating.) He quit work entirely in 1978. The administrative law judge (ALJ) found that Stephens is unable to do his old work or any other than sedentary work. But because Stephens was only 39 years old at the time of the hearing and had a ninth-grade education, the ALJ found him not disabled under the Grid, a set of rules that translate age,

impairment, and other characteristics into a finding of disability or no disability. The Appeals Council declined to review the decision, and the district court found the decision supported by substantial evidence.

Stephens's case highlights the difficulties created by a statute that requires the ALJ to give a yes-or-no evaluation of a medical problem. The more complex the task, the more arbitrary any effort to sort the results into just two bins. Disability cases raise questions of medicine (what is wrong with Stephens, and will it get worse?), of psychology (how much pain does Stephens suffer, and what effect does the pain have on his ability to work?), of vocational education (just what can a person in Stephens's position do?), and of practical economics (what jobs are available for people who can do whatever Stephens can do?). An effort to sort a million people with a million personal histories and ten thousand different ailments into just two bins—"disabled" and "not disabled"—ensures "arbitrary" action. It is arbitrary in the sense that many people called "not disabled" must look almost exactly like many people called "disabled." It is arbitrary in the sense that many combinations of ailments and personal situations do not fit well in any category, let alone one of the only two permitted by statute. See *Heckler v. Campbell*, 461 U.S. 458, 468, 103 S.Ct. 1952, 1958, 76 L.Ed.2d 66 (1983) (sustaining the Grid as a way to make this process more uniform); *Cummins v. Schweiker*, 670 F.2d 81, 83–84 (7th Cir.1982).

When Congress calls on the Executive Branch to perform a million discretionary and unavoidably arbitrary acts, it becomes very tempting for the Judicial Branch to point out the element of arbitrariness that affects a fair number of cases and to order the task done again. Certainly there is no shortage of arbitrariness in disability cases. But the very nature of the task calls for modesty. Courts cannot enlarge the number of permissible outcomes. We cannot take a person whose ailments foreclose 75% of all gainful employment (or reduce his expected income by 75%) and order the award of 75% benefits. Only

Congress has that choice. When any outcome is imprecise and hence arbitrary, a court must accept a decision of the agency if that decision follows the agency's rules. The governing statute, 42 U.S.C. § 405(g), limits the review of factual findings by providing that the "findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive". We agree with the district court that the ALJ's findings are supported by substantial evidence, and we therefore affirm.

The record contains reports by at least eleven medical professionals. The two reports most strongly supporting Stephens come from Dr. L.S. McCallister, a general practitioner who attends Stephens, and Orval Keller, Stephens's chiropractor. Dr. McCallister reported that Stephens has a severe limitation on motion of the spine, is unable to bend comfortably, and cannot bear stress in the lumbo-sacral area without severe pain. Dr. McCallister concluded that Stephens is disabled. Keller also diagnosed an injury to Stephens's spinal cord that produces pain when Stephens bends his back. He concluded that Stephens can do no pushing or lifting and therefore is disabled. Several other medical reports attest to limitations on Stephens's motion and to the pain that drove him to hospitals; Stephens gave testimony about the limitations and the pain.

Dr. David Reich, a resident in neurology at Indiana University, rendered one of several contrary reports. Dr. Reich found that Stephens has full mobility in his arms and legs and not much pain with normal motion. He found no evidence of disc slippage but some mild hip disease. After the hearing, the ALJ sent Stephens to three more professionals. Dr. Lee M. Cattell, an orthopedic surgeon, examined Stephens fully. Cattell found some tenderness of the muscles in the lumbo-sacral area but a full range of motion without pain. He found Stephens's spine normal. Stripped of medical jargon, Dr. Cattell's report said that there were no physiological restrictions on Stephens's movement and that he could work eight hours a day without much dis-

comfort, so long as the work did not call for more than occasional lifting of weights exceeding 50 pounds. Dr. E. Carl Hann, a neurologist, performed a full exam and found the same tenderness but no measurable abnormal performance and no distress when Stephens performed hip maneuvers. G. Matt Howard, a chiropractor, concluded that irritation of the spinal nerve by intrusions from bone causes some muscle spasms and that Stephens cannot do physical labor, but that he was not otherwise disabled. Howard opined that Stephens "has a 30 percent total impairment of the whole man".

The ALJ found that Stephens cannot return to his old job doing manual tasks in the warehouse but can do sedentary work. The record supports this conclusion, though it does not compel it. The medical evidence was conflicting; the medical reports were all based on first-hand examinations by evidently competent professionals; someone had to resolve the conflict, and under the statute that someone is the Secretary's delegate.

## II

The ALJ's opinion sets out all of these reports (and others), and we are confident that he overlooked nothing. Indeed, he approached the job with care, ordering three additional examinations after the hearing. Stephens nonetheless maintains that we must remand the case because the ALJ did not specifically address his complaints of pain. He points out that this court has required ALJs to make specific findings when they reject evidence supporting a claimant. E.g., *Garfield v. Schweiker*, 732 F.2d 605, 609–10 (7th Cir.1984); *Zblewski v. Schweiker*, 732 F.2d 75, 78–79 (7th Cir.1984); *McNeil v. Califano*, 614 F.2d 142, 144–45 (7th Cir.1980).

We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens.

Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. Cf. *Heckler v. Day*, —— U.S. ——, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984) (discussing delay in the process). When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. Thus we held in *Zblewski* that "when the ALJ fails to mention rejected evidence" (732 F.2d at 79) the court must send the case back, for it cannot tell whether the ALJ fulfilled his statutory duty. The evidence the ALJ did not mention in *Zblewski* "went uncontradicted." *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir.1985). This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits. But as we pointed out in *Zblewski* and reiterated in *Zalewski*, this court does "not require the ALJ to evaluate in writing every piece of testimony and evidence submitted." *Zalewski, supra*, 760 F.2d at 166. We require only "a minimal level of articulation by the ALJ as to his assessment of the evidence ... in cases in which considerable evidence is presented by the claimant". *Ibid.*

If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough. We have never embraced the more extensive proposition, which may be

the rule in the Third Circuit, that the ALJ must mention and assess in writing every piece of evidence. *Cotter v. Harris*, 642 F.2d 700 (3d Cir.), opinion on denial of rehearing, 650 F.2d 481 (1981). Stephens argues that this court follows *Cotter* because we have cited it (e.g., in *Zblewski, supra,* 732 F.2d at 79). But to cite a case is not to endorse all of its reasoning. Our *decisions* (which are distinct from our citations) make a more limited demand on ALJs. By "minimal level of articulation" we mean just that—enough to show that the ALJ considered the evidence the law requires him to consider. A more extensive requirement sacrifices on the altar of perfectionism the claims of other people stuck in the queue.

A court must examine the entire record of the proceedings to determine whether there is "substantial evidence" for the decision. That means that a court must assess the evidence favoring the claimant as well as the evidence favoring the rejection of the claim. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The difficulty of dealing with conflicting medical evidence is no reason to take the task lightly—not for us, and not for the ALJ. Just as a court should not demand too much from the ALJ, so a court should not accept too little. Judicial opinions send messages. That is why we do not insist on completeness in the ALJ's reasoning; it is also why we insist that the ALJ acknowledge potentially dispositive evidence. The conclusion that the agency has substantial discretion to balance the demands of expedition and perfection does not imply a decision to give the agency *carte blanche*. Without question, however, the arbitrariness of the decision the ALJs are called on to make implies that they have very wide latitude. When there is no one "right" answer to a legal dispute, it is difficult to say that selection of any one outcome is legal error. *In re Sinadinos*, 760 F.2d 167, 170 (7th Cir.1985). This, and not some desire to relieve the ALJs of legal constraints, is why judicial review is properly quite limited.

The ALJ in this case has done enough. The ALJ's opinion recounts the views of every medical professional who examined Stephens. It is apparent that the ALJ considered Stephens's pain in making the decision. Stephens does not suffer drastic physiological restrictions of mobility. His joints move freely. Stephens's problem is that he suffers pain when doing certain things. The pain that accompanies movement is the source of his limitations. When the ALJ found that Stephens could not do his old job, he credited the claims of limitations caused by pain. Yet the medical evidence also supports a conclusion that Stephens's problems are much less serious if he need not bend, push, flex, or lift. Thus the ALJ was entitled to conclude that Stephens can do sedentary work. This is a logical path to a conclusion supported by substantial evidence. True, the ALJ did not articulate it in so many words, but the statute does not require full explanation.

### III

Stephens raises one final objection. The ALJ gave special weight to the reports of the orthopedic surgeon and the neurologist. Stephens argues that the ALJ should have given special weight instead to the reports of his general practitioner and chiropractor because they were more familiar with his physical state. He relies on *Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977), which found unsupported by substantial evidence a decision in which the ALJ preferred the report of a consulting physician over the views of the claimant's general practitioner.

*Allen* does not hold that the report of a general practitioner controls whenever physicians disagree. The court held only that the ALJ must take into account the treating physician's ability to observe the claimant over a longer period. When experience backed by observation is set against the "speculative statement" (552 F.2d at 786) of a consulting physician, substantial evidence lies on the side of the treating physician. See also *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982) (report of the

treating physician should be favored over that of a consultant who merely reviews the file and does not examine the claimant, unless the treating physician is not credible).

■ The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. *Cummins v. Schweiker, supra*, 670 F.2d at 84. The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise. A lawyer with a general practice often brings in a specialist for a few hours' consultation and pays handsomely; the specialist's review of an antitrust problem may reveal more than two weeks of work by a lawyer who handles few antitrust cases. Similarly, a physician who specializes in diseases of the thorax may contribute more knowledge to the administrative process after a one-hour examination than the general practitioner (who sees few thorax problems) contributes after years on the case. Many patients pay premium prices to have an hour's time with a physician with expertise in the precise problem they face, greatly preferring an hour of top-quality care to a week of average care. The consulting specialist can tell how a patient fits in a spectrum of similar ailments, something the non-specialist may not be able to do.

The Secretary's delegate is free to make the same sort of choice an informed patient may make for himself. Experience and knowledge of this case lie on the side of the treating physician, expertise and knowledge of similar cases on the side of the consulting specialist. How these weigh in a particular case is a question for the Secretary's delegate, subject only to the rule that the final decision must be supported by "substantial evidence." See *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Strunk v. Heckler*, 732 F.2d 1357, 1362–64 (7th Cir.1984).

The specialists took the time necessary to render complete reports. They examined Stephens and did not just shuffle papers. Their reports are factual, not speculative. (Dr. Hann carefully separated his medical views from what he viewed as impermissible speculation about how Stephens would fare in a workaday environment.) The ALJ was entitled to favor these reports over the contrary views of the treating physician and treating chiropractor.

AFFIRMED.

FLAUM, Circuit Judge, concurring.

The majority opinion represents, in my view, a marked, unnecessary, and unfortunate departure from the precedent established by this circuit in *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir.1984), and followed in subsequent cases, rather than the logical progression from that precedent that the majority suggests. The majority's attempt to minimize this circuit's established standard would perhaps be understandable, though still not appropriate, if the ALJ's opinion below failed to meet that standard. But that is not the case here. I therefore write separately to underscore that the ALJ in this case clearly met the existing standards that this circuit has heretofore established for the proper evaluation of Social Security disability cases, and to express disagreement with the majority's unduly restrictive view of the roles of the ALJs and the courts in adjudicating disability claims.

I.

The Social Security Act provides that the Secretary must issue findings of fact and render decisions as to the rights of an individual applying for disability insurance benefits. 42 U.S.C. § 405(b)(1) (1982). In cases where the Secretary renders a decision unfavorable in whole or in part to a claimant, the Act also requires that the Secretary include in the decision a statement of the case in understandable language that discusses the evidence and that gives the reasons for the Secretary's decision. *Id.* In interpreting these provisions, this circuit has enunciated standards that

the ALJ must follow in making its findings and in rendering its decision, so that this court can properly perform its task of reviewing whether the ALJ's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g) (1982).

In *Zblewski*, 732 F.2d at 78, this court emphasized that although it was required to defer to the credibility findings made by the ALJ as factfinder, it had to verify that the ALJ had indeed made such findings. While we have recognized the heavy caseload of the ALJs, we have consistently held that an ALJ must offer a minimal level of articulation as to his assessment of the evidence in cases where considerable evidence is presented by the claimant to counter the agency's position. *Id.* at 79. *See also Zalewski v. Heckler*, 760 F.2d 160, 165–66 (7th Cir.1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir.1984); *Taylor v. Schweiker*, 739 F.2d 1240 (7th Cir.1984); *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984).[1] The requirement of a "minimal level of articulation" has never been interpreted to require literary perfection in an ALJ's opinion, nor is it so unduly burdensome as to hinder the ALJ's resolution of disability claims. The majority's analysis in this regard makes the common and, I believe, erroneous assumption that an ALJ opinion that satisfies this simple requirement must be lengthier, or must take longer to formulate, than one that does not. The purpose of requiring this minimal level of articulation is merely to enable us to determine from an ALJ's opinion whether the ALJ considered and assessed the relevant evidence, a determination which is essential if we are to perform our statutorily-mandated review function. *Zalewski*, 760 F.2d at 167.

The claimant in this case argues that the ALJ committed reversible error by failing to consider the claimant's testimony as to his pain and by failing to make any findings as to the claimant's pain. I believe that the ALJ has sufficiently articulated his assessment of the evidence concerning the claimant's pain, thereby permitting this court to engage in a meaningful review of the case. The ALJ in this case set forth a complete and accurate picture of the evidence, as the majority opinion correctly points out. Contrary to what the majority suggests, however, this is not all that an ALJ is required to do when deciding a Social Security case. We have repeatedly held that the ALJ must also offer his assessment of the evidence and his reasons for rejecting or crediting particular evidence, such as lack of credibility. *Zalewski*, 760 F.2d at 166–67; *Zblewski*, 732 F.2d at 79.

In the present case, the ALJ offered a detailed evaluation of the medical evidence that was submitted. At the outset, the ALJ recognized that the medical evidence was conflicting: he stated that the claimant's chiropractor, Dr. Keller, and a general practitioner, Dr. McCallister, both indicated that the claimant was totally disabled; while the neurological examinations conducted by Dr. Reich and Dr. Hann and an orthopedic evaluation by Dr. Cattel did not show any serious impairment. The ALJ concluded that the evidence presented at the hearing, especially Dr. Cattel's examination of the claimant, indicated a residual functional capacity for sedentary work. The ALJ also indicated that in reaching this determination, he had placed great weight on the opinions of the orthopedic and neurologic specialists, since their findings gave a more accurate assessment of the claimant's residual functional capacity than did the opinions of the treating chiropractor or the general practitioner.[2] The ALJ's deci-

---

1. The majority seems to suggest, *ante* at 287, that this assessment of the evidence is required only when a claimant's evidence is uncontradicted by the agency. We expressly held in *Zalewski*, however, that credibility findings were required (and provided) in that case, a case involving contradictory evidence as to the claimant's ability to handle a job that required standing or walking. *See Zalewski v. Heckler*, 760 F.2d 160, 163–65 (7th Cir.1985).

2. The claimant states in his brief that the decision by the ALJ must be remanded because the ALJ "made no findings concerning pain, nor did he even discuss the issue of pain." I disagree. The ALJ thoroughly summarized the claimant's

sion to give greater weight to the consulting physicians' opinion was completely appropriate, notwithstanding *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982), because the consulting physicians in this case personally examined the claimant. In sum, these findings by the ALJ clearly meet the threshold standard that this circuit has established to ensure meaningful appellate review.

## II.

Having concluded that the ALJ's decision in this case complies fully with the clearly-established requirements of our prior decisions, I see no need to elaborate further on those decisions. The majority, however, out of apparent concern that our decisions have been misconstrued as manifesting a "fetish about findings," *ante* at 287, has seized upon this opportunity to characterize disability determinations as inherently "arbitrary," *ante* at 286, to stress the "modesty" of the task that Congress has called upon the ALJs and the courts to perform, *ante* at 286, and to express our judicial willingness to accept a "sketchy opinion" by an ALJ in order to avoid "sacrific[ing] on the altar of perfectionism the claims of other people stuck in the queue," *ante* at 287–288. The majority opinion therefore conjures up a picture of a Social Security disability system in which the nature of the decision to be made is so hopelessly arbitrary, and the lines of claimants waiting for a decision so interminably long, that the ALJs and the courts can aim for little more than to decide as many cases as possible, as quickly as possible. I believe that the tenor—if not the substance—of the majority's remarks might convey an inappropriate message concerning this court's view of the roles that Congress has assigned both to the ALJs and to the courts in the adjudication of disability claims.

As the majority correctly notes, Social Security disability benefits are not available to all who have some degree of physical or mental impairment. ALJs are continually faced with the competing interests of speed and thoroughness when deciding the hundreds of cases before them. The benefits will not go to all who have some need, but should go to those who qualify under the guidelines set out by Congress. Although ALJs are under intense pressure to process the greatest possible number of cases within a given time period, true efficiency in this system should consist of deciding the greatest number of cases as accurately as possible in the shortest amount of time. As the Supreme Court explained in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971):

> The Social Security Act has been with us since 1935.... It affects nearly all of us. The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend. But, as the Government's brief here accurately pronounces, "Such a system must be fair—and it must work."

*Id.* at 399, 91 S.Ct. at 1426 (footnote omitted). *See also Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.1984) (although disability system "must run efficiently and expeditiously ... [t]he function of the ALJ is not merely to sit and listen, nor is he appointed to process cases on an administrative assembly line").

Just as only Congress can decide whether to entertain claims for partial disability, *ante* at 286, so only Congress can strike the proper balance between the competing demands of quantity and quality in the processing of claims for total disability. It is doubtful whether the majority's ap-

complaints of pain and also completely presented the doctors' reports, which also reviewed the claimant's complaints of pain. The Social Security Act defines a "physical or mental impairment" as an "impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3) (1982). It is apparent that the ALJ's thorough assessment of the medical evidence relating the claimant's complaints of pain and the ALJ's credibility finding that the reports of the neurologists and orthopedic doctor were more accurate than the other doctors' reports satisfied this circuit's requirement regarding credibility findings.

proach to the adjudication of disability claims would comport with congressional intent in this regard. As the Supreme Court recently noted in rejecting, based on a comprehensive review of recent legislative history, judicial injunctions requiring the Secretary to adjudicate disputed disability claims within mandatory deadlines: "Certainly in Congress the concern that mandatory deadlines would jeopardize the quality and uniformity of agency decisions has prevailed over considerations of timeliness." *Heckler v. Day,* —— U.S. ——, 104 S.Ct. 2249, 2255, 81 L.Ed.2d 88 (1984). The Court further emphasized that despite its awareness of the long delays associated with the adjudication of disputed disability claims, Congress nevertheless chose in 1980 and 1982 to pass additional legislation designed "to ensure quality and uniformity in agency adjudication" that in effect "will impose additional duties on the Secretary and her heavily burdened staff." *Id.* at 2256–57. Indeed, it was in 1980 that Congress amended section 405(b) to require that the Secretary include in every initial determination of ineligibility an easily-understandable statement of the relevant evidence and the reasons underlying the determination. *See id.* at 2256. Against the background of this legislative history, it seems unlikely that Congress would wish us to communicate to the ALJs that the nature of their task in deciding disability cases is "arbitrary" and "calls for modesty."

Similarly disturbing are the majority's intimations regarding our role in performing the task that Congress has prescribed for us in reviewing disability decisions. As the majority correctly notes our duty is only to review the agency's decision to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). The substantial evidence standard, while undoubtedly deferential, is also not toothless. Justice Frankfurter stated it best in explaining the comparable role of courts of appeals in reviewing decisions of the National Labor Relations Board to determine whether they are supported by substantial evidence:

Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). *See also McNeil v. Califano,* 614 F.2d 142, 146 (7th Cir.1980) (in reviewing disability decisions, "[w]e must be more than an uncritical rubber stamp, but we must affirm the Secretary's decision if it is supported by substantial evidence"); *Schlabach v. Secretary of Health, Education and Welfare,* 469 F.Supp. 304, 306–08 (N.D.Ind.1978) (generally discussing judicial review of ALJs' decisions in disability cases).

Regardless of our individual views as to the efficacy of judicial review or the importance of deferring to agency decisions, Congress has charged us with the obligation of conducting a careful review of the agency's disability determinations. In order to fulfill this obligation, we must be able to determine whether the ALJ considered and evaluated the relevant evidence. True deference to the legislative will in this context therefore requires us to demand more than sketchiness on the part of the ALJ. To the extent that this court's recent decisions may have been misinterpreted as creating a "fetish about findings" or as placing inappropriate emphasis upon the ALJs' literary skills, I welcome and join in the assurances given by the majority. However, to the

extent that the majority's opinion implies that this court will not bring to its task of review the same oversight that we have exercised in our prior decisions in disability cases, I must disassociate myself from its message.