**Edilberto AVILES, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 85 C 01820.**

United States District Court, N.D. Illinois, E.D.

Sept. 30, 1985.

Agustin G. Garcia, Quinones & Garcia, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., Margaret C. Gordon, Asst. U.S. Atty., N.D. Ill., Donna Morros Weinstein, Regional Atty., Dept. of Health and Human Services, Chicago, for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Edilberto Aviles ("Aviles") seeks judicial review of a final decision by Secretary of Health and Human Services Margaret Heckler ("Secretary") denying Aviles disability insurance and supplemental security income benefits. Aviles initially applied for benefits under the Social Security Act ("Act") §§ 216(i), 223 and 1602, 42 U.S.C. §§ 416(i), 423 and 1381a. After a Novem-

ber 14, 1984 evidentiary hearing (the "Hearing"), Administrative Law Judge Peter Scalise ("ALJ Scalise" or simply the "ALJ") denied Aviles' application December 10, 1984. Aviles then exhausted his administrative remedies in proper sequence (a process that resulted in the ALJ's decision becoming Secretary's) and brought this action against Secretary pursuant to Act § 205(g), 42 U.S.C. § 405(g).

As invariably occurs in these actions, which come to this Court on the administrative record and a decision by Secretary, the parties have filed what they have labeled cross-motions for summary judgment. In fact, however, Aviles' motion is "to remand his case to the Secretary of [sic—should be 'for'] further administrative review," and Secretary Mem. 13 n. 2 essentially concedes the propriety of a remand. For the reasons stated in this memorandum opinion and order, this case is remanded to Secretary for further proceedings consistent with this opinion.

### Background

Aviles, who was 43 years old at the time of the Hearing, was born in Puerto Rico. He has an eighth-grade education and is literate in Spanish, but his English is apparently poor (the Hearing was conducted through an interpreter). Since 1967 he has held jobs with five firms in the Chicago area, most recently as a line assembler with Stern Electronics ("Stern") from February 1978 to June 1982. On June 17, 1982 Stern laid him off because he was missing work two or three days a week.

Aviles claims disability because he suffers from hypertension, gout and arthritis, which produce disabling headaches, dizziness and an inability to walk. He testified he was regularly missing work at Stern because he was "sick on [his] feet and [he] could not work a full week" (R. 33). Aviles submitted a handwritten note (R. 110) from his physician, Dr. Rumilla[1]:

TO Whom it may concern:

that Mr. EDILBERTO AVILES Treated by me since 1/6/78 for HYPERTENSION & polyarthritis. BP up sometimes to 180/115[.] [L]ast time seen on 12/8/83 his BP was 150/100[.] Taking MODURETIC one a day and INDOCIN....

Dr. Bacalla's October 7, 1983 consultative examination (R. 97–100) also found Aviles' blood pressure was 150/100 (it is worth noting Aviles, 5'5¼" tall, then weighed in at 197 pounds). Dr. Bacalla went on to find:

1. Aviles was "without any significant evidence of end-organ damage."

2. Aviles' history of chest pain was "not typical of angina pectoris," and a chest x-ray showed "normal heart size without any evidence of pulmonary congestion."

3. Aviles gave a history of gout attacks occurring once or twice per month, involving the knees and feet and occasionally the right upper extremity.

4. "On examination of this patient, he is able to ambulate with minimal limp towards the right side but independently. There was tenderness over the dorsum of the right foot. There were no signs of acute inflammation during the examination. The rest of the joints in both upper and lower extremities revealed no significant bony deformity or restriction of movement of the joint. The SM4–12 revealed an elevated uric acid of 9.4 mgs."

Dr. Panitch's shorter report of a February 21, 1984 consultative examination (R. 111–12) is consistent with Dr. Bacalla's re-

---

1. While written in the first person, the note (written on a prescription blank of the California-Fullerton Medical Center bearing the imprint of Dr. A. Rumilla and Dr. A. Guevara) is not signed, so it is impossible to determine who wrote it. There is an arrow at the note's bottom right corner, suggesting more writing (and perhaps a signature) on the reverse side, but that side is not reproduced by photocopy as part of the Hearing exhibit. ALJ Scalise's decision assumed the note was by Dr. Rumilla (R. 8), although Aviles said he had been treated by both doctors (R. 40). Though the unreproduced reverse side of the note might have contained other information relevant to Aviles' medical history, this Court must take the record as it finds it.

sults, except that Dr. Panitch measured Aviles' blood pressure at 180/120 (Aviles then tipped the scales at 192 pounds). Dr. Panitch's diagnosis read:

Hypertension, uncontrolled.

Heavy alcohol abuse.

Gout by history with possible gouty arthritis.

On July 25, 1984 Dr. Rumilla examined Aviles (R. 136–40) and found his gout was "getting better" and "will be better" with diet and medication. His weight was 209 pounds and his blood pressure was 160/100, but his EKG, urinalysis and heart were normal.

On August 27, 1984 Aviles received emergency room treatment at Cook County Hospital. His blood pressure was 164/130, his left knee was swollen and very painful to the touch and there was slight edema in the left ankle (R. 132). Aviles was advised to take colchicine and Aldomet, follow a low-salt diet and return in three days for another examination (R. 133). Aviles did not return until November 1, 1984,[2] when his blood pressure was 160/110 and the diagnosis reflected uncontrolled hypertension, lower back strain and a history of gout (the work-up for gout was not completed due to Aviles' noncompliance) (R. 134–35).

At the Hearing Aviles testified he could not exercise, could walk only half a block at a time (R. 38), had a lot of headaches on top of his head, could not bend over and had to use crutches in the morning because of pain in his feet (R. 40). He said in his present condition he could not sit or stand for an eight-hour work day (R. 41).

*Applying the Statutory Framework*

To establish entitlement to disability benefits, a claimant must show he or she is "disabled." Act § 216(i)(1), 42 U.S.C. § 416(i)(1) defines "disability" as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months....

Once the claimant has demonstrated an impairment of sufficient severity to preclude the type of work he or she previously performed, the burden shifts to Secretary to prove there exists other "substantial gainful employment" the claimant can do. *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir.1982).

*Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir.1984) (citations omitted) summarizes what has been the five-step inquiry[3] to be used by the ALJ in determining disability, with a shift in the burden from the claimant to Secretary between steps 4 and 5:

The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled.

In applying step 5 the ALJ typically looks to the "Grid," medical-vocational guidelines (found at 20 C.F.R. Subpart P, Appendix 2) that balance the claimant's physical limitations against his or her age, education and work experience. Alternatively the ALJ may base the step 5 determination on other evidence, including the assessment of a vocational specialist (20 C.F.R. § 404.1566(e)).

---

**2.** ALJ Scalise's decision mistakenly dated the second visit January 1, 1984 (R. 9). That is an obvious misreading of the "11/01/84" date at the top of the emergency room form (R. 134).

**3.** Because the ALJ did not rule for Secretary at the second step, it is irrelevant for current purposes that our Court of Appeals has recently invalidated that part of Secretary's formulation. *Johnson v. Heckler*, 769 F.2d 1202, 1209–13 (7th Cir.1985).

Secretary's decision must be affirmed on appeal unless the findings are not supported by substantial evidence or Secretary has applied incorrect legal standards. 42 U.S.C. § 405(g). *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), has defined "substantial evidence" as:

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Based on the medical evidence and Aviles' testimony, the ALJ found in Aviles' favor at steps 1 and 2 of the sequential analysis. But as to steps 3 and 4 the ALJ concluded (R. 10):

> 3. The medical evidence establishes that the claimant has severe gout and hypertension, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.
>
> \*    \*    \*    \*    \*    \*
>
> 7. The claimant's impairments do not prevent the claimant from performing his past relevant work.

In support of that last conclusion the ALJ found (*id.*):

> 4. The claimant's complaints of disabling headaches, dizziness, and inability to walk due to gout are not credible in view of the medical evidence of record.
>
> 5. The claimant has the residual functional capacity to perform work-related activities except for work involving heavy lifting and frequent bending (20 C.F.R. 404.1545 and 416.945).
>
> 6. The claimant's past relevant work as a line assembler did not require the performance of work-related activities precluded by the above limitation(s) (20 C.F.R. 404.1565 and 416.965).

Aviles challenges the step 4 determination that he can perform his past relevant work. It is not that he contests the ALJ's rejection of his subjective complaints in light of the medical evidence—he does not. Rather he urges his past work as a line assembler *did* involve heavy lifting, so—given the ALJ's finding he cannot do that—the step 4 determination was incorrect as a matter of law.

### Aviles' Past Work Experience

■ ALJ Scalise's decision found that on Aviles' job as a line assembler he typically "walked two hours, stood eight hours, occasionally bent and carried very small parts" (R. 8). Those findings were obviously drawn directly from the circled items and written notations on one page (R. 84) of the Department of Health and Human Services ("HHS") form Vocational Report signed by Aviles August 29, 1983 ("Vocational Report," R. 83–88). That information, clearly relating to Aviles' most recent job at Stern,[4] described that job as (R. 84):

> Putting parts together with screws. Used hand tools such as screwdrivers, air guns, yankee screwdriver, hammer. Parts which were put together were contacts, light sockets, coils, etc. Stapled cables with air gun.

But it must be remembered the Vocational Report could not have been filled out by Aviles himself (he lacked the English to do so), so it had to represent an interviewer's understanding of what Aviles had told him or her. By contrast, the Hearing reflects the following colloquy (R. 23–24):

> Q. From February 2, 1978 to June 17, 1982, you worked at Stern ... Electronics ... as an inspector.[5] Your job as an inspector probably required you to carry heavy weights[;] more than 10 pounds?
>
> A. More than 50 pounds.

---

**4.** Aviles' Work Background form (R. 142) described his job at Stern as both "assembler" and "inspector," while the Report (R. 84) referred to the job as "line assembler" (the same term used in the ALJ's decision (R. 8)).

**5.** See n. 4.

Q. And, for instance, what, what did you call the job where you had to lift more than 50 pound weights?

A. I have to take the boards that brought in the electronics, pinballs, the games, pinball games. They came into these boards and.

Q. How much did they weigh about?

A. I used to lift these boards and put them on a rack. They made a pinball machine that weighed over 80 pounds.

Q. How did you know that they weighed more than 80 pounds?

A. Because the boss, took two of us to lift these boards.

\* \* \* \* \* \*

A. Because one of the guys working there hurt his back and was hospitalized for a while.

That testimony tracks directly with the information on an undated HHS Claimant's Work Background form ("Work Background," R. 142), listing Aviles' past employers and stating as to the Stern job:

Lifted pinball machines that weighed over 80 lbs. Knew because his boss helped him and one other co-worker hurt his back on acct of lifting heavy weights[6]....

Finally, the job description (R. 73–74) in the August 18, 1983 HHS Disability Report form ("Disability Report," R. 69–76) is somewhat garbled. It describes a typical day as involving eight hours' walking, eight hours' standing, no sitting, constant bending and constant reaching (R. 74). Then in the "Lifting and Carrying" section the form describes Aviles' work at the "toy factory" (Playskool, where he worked the year before Stern) rather than at Stern itself, and a checkmark under "HEAVIEST WEIGHT LIFTED" falls somewhere be-

tween the adjacent "20 lbs." and "50 lbs." boxes (*id.*).

What all this reflects is an impermissible singling out by the ALJ—without saying so or (at least equally important) saying why—of one second-hand recording of what an unknown interviewer had understood Aviles to say in the Vocational Report. That version was totally inconsistent with everything else in the record—whether essentially contemporaneous, or recorded at an unstated time, or in the only first-hand version (Aviles' Hearing testimony). Cf. *Jackson v. Heckler*, 592 F.Supp. 1124, 1128 (N.D.Ill.1984) (claimant's own description of her work at hearing justified ALJ in finding it was "light or sedentary" work she was presently capable of performing). And it must be remembered all the information comes from Aviles himself in any event—this is not a typical battle of conflicting medical opinions, or the other typical situation in which an ALJ or court makes a choice of objective medical evidence over a claimant's subjective complaints.

If the ALJ had any doubts as to Aviles' credibility in testifying about his having to lift heavy weights over 50 pounds,[7] he did not evidence them by probing further with questions when he had Aviles before him. ALJ Scalise's decision does not *say* either that he disbelieved what Aviles said or, if so, why. As *Zblewski v. Schweiker*, 732 F.2d 75, 78–79 (7th Cir.1984) teaches:

While we must defer to the credibility determinations of the fact-finder, we must be sure that the ALJ has indeed made a credibility determination.... In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only

---

6. That represents this Court's best efforts to make out an only fair photocopy of a handwriting that is scarcely a model of the Palmer (or any other) method of penmanship. Though not in the same handwriting as the rest of the form, the quoted language is again someone else's rendition of what Aviles said (note the third-person usage).

7. "Heavy" is a term of art in this area of the law—not as to individual weights, but as to categories of work. 20 C.F.R. § 404.1567 classifies "medium work" as involving the lifting of no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. "Heavy work" is classified as involving the lifting of no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons (*e.g.*, lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review. As the Third Circuit put it in *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981), when the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."

True enough, *Stephens v. Heckler*, 766 F.2d 284 (7th Cir.1985) may perhaps narrow *Zblewski's* holding to some extent,[8] reading *Zblewski* to require only the mentioning of "uncontradicted evidence" rejected by the factfinder. As *Stephens*, 766 F.2d at 287 put it:

If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.

Despite the ALJ's total failure to mention the principal evidence and how it was at war with his stated finding, it is easy enough to "trace the path of the ALJ's reasoning"—and that reasoning itself is fatally self-contradictory. ALJ Scalise specifically found Aviles could perform work-related activities "except for work involving heavy lifting and frequent bending" (R. 10). Nothing whatever in the medical evidence addresses Aviles' ability to do those things. Necessarily, then, the ALJ's determination on that score must have credited Aviles' own testimony (the only record evidence on the subject) that he was "sick on [his] feet" and could not work a full week as a line assembler at Stern (R. 33). That leaves wholly unexplained, in rational terms, any failure by the ALJ to credit Aviles' contemporaneous testimony that the Stern job in fact required heavy lifting and frequent bending.

Though no ALJ should thus force a reviewing court to indulge in speculation, it may perhaps be the ALJ relied on the part of the Vocational Report describing the job as assembly work with small tools—and that description may well have been accurate as to what most of Aviles' time on the job entailed. But as *Valencia v. Heckler*, 751 F.2d 1082, 1086 (9th Cir.1985) states:

Every occupation consists of a myriad of tasks, each involving different degrees of physical exertion. To classify an applicant's "past relevant work" according to the least demanding function of the claimant's past occupations is contrary to the letter and spirit of the Social Security Act.

It may be that some jobs classified as "line assembly" work would not involve much heavy lifting (though that is hardly an apt matter for some unstated form of judicial notice). But if an employee must lift any weights over 50 pounds, 20 C.F.R. § 404.1567 classifies his job as "heavy work." Aviles was not in a position to define his own job and parse out the aspects he was incapable of managing, refusing to perform that part of the work required for total performance. No more could the ALJ (or this Court) redefine Aviles' job.

ALJ Scalise's finding that Aviles cannot do heavy lifting differentiates this case from those in which issues are controverted and ALJs make permissible credibility determinations. It is impossible to characterize the ALJ's own internally inconsistent treatment as supported by substantial evidence. Whether (1) by his failure to be struck by the obvious fact the one inconsistent statement about job content was in an English-language form filled out by someone other than Aviles, or (2) by oversight, or (3) by faulty reasoning, or (4) by a combination of those factors, the ALJ did not fulfill his duty "to determine the physical demands of the particular type of ... work [Aviles] had done and then compare

---

**8.** That may or may not be so. *Johnson,* 769 F.2d at 1212–13 and *Rousey v. Heckler,* 771 F.2d 1065, 1069, 1071 (7th Cir.1985) give strong surface indications of internal disagreements with-

in our Court of Appeals about the *Stephens* abdication of any effective judicial review of ALJ decisions.

those demands to [his] present capabilities." *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir.1984). Secretary's Mem. 13 n. 2 admits as much (though she "reasons" from that acknowledgement to the wrong remedy):

> It is unclear from the ALJ's decision whether he did ascertain the demands of plaintiff's past relevant work as a line assembler and compare them with his present physical capacity in concluding that his impairments do not prevent him from working as a line assembler now.

Because the ALJ found (erroneously) Aviles could perform his relevant past work, the ALJ stopped the analysis there and did not proceed under step 5 to determine (via the Grid or otherwise) whether Aviles is able to perform any other work available within the economy. *Strittmatter*, 729 F.2d at 509–10. That of course represents a failure on Secretary's part to meet her burden of going forward, which had shifted to her at that stage of the analysis. *Whitney*, 695 F.2d at 786. And the law could perhaps impose the consequences of that failure on Secretary, who controls the shape and scope of disability hearings, by this Court's entry of a final ruling in Aviles' favor.

■ Any such general rule, however, would undercut the whole concept of the five-step inquiry. *Garfield*, 732 F.2d at 607 n. 2 specifically recognized the ALJ could properly stop his or her analysis with a step 4 finding adverse to the claimant:[9]

A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled.

And so it was in *Whitney*, 695 F.2d at 789–90 (a case much like this one) that our Court of Appeals found a remand necessary for application of the "Grid" step.

Here too this Court cannot substitute its judgment for administrative expertise. Its task ends with determining Secretary's findings cannot be supported by substantial evidence. Remand is the appropriate result.

### Conclusion

No substantial evidence exists to support ALJ Scalise's conclusion that Aviles can perform his past relevant work as a line assembler. Secretary's motion for summary judgment is therefore denied.

It remains to be determined whether Aviles is capable of performing other work available within the economy. In accordance with Aviles' motion, this case is remanded to Secretary for that determination under step 5 of the sequential analysis.[10] In view of the very limited scope of remand (which will call for either no further evidentiary hearing or one of narrow compass), Secretary is ordered to complete that determination within 91 days from the date of this order.

---

9. That is not of course necessarily the same as saying the ALJ is free to develop less than a complete record—one enabling a decision at every step of the analysis. After all, at the time of the hearing the ALJ has not reached his or her decision, and hence must obtain all the grist for the decisional mill. *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir.1981) (per curiam) (ALJ has "a basic obligation at such hearings to develop a full and fair record"). If there is any gap in that respect, it is only fair to impose the risk of that deficiency on Secretary. See, e.g., *Taylor v. Weinberger*, 512 F.2d 664, 668–69 (4th Cir. 1975) (remand to allow Secretary to "start all over again in his determination to deny benefits" to claimant inappropriate).

10. This result implicitly embraces a decision that should be made explicit: It is *not* open on remand for Secretary to reconsider, as her Mem. 13 n. 2 suggests, whether Aviles has the "ability to perform his *former* work" (see n. 9). And given the state of the record, the need for Aviles to have filed this action and the argument asserted by Secretary and rejected by this opinion, this Court finds Secretary was not "substantially justified" in her position, so that attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), may be awarded even though this Court has ordered a remand and not an outright reversal. See *Bohn v. Heckler*, 613 F.Supp. 232, 234 (N.D.Ill.1985).