**Major CUNNINGHAM, Plaintiff,**

v.

**Donna SHALALA, Secretary of Health and Human Services, Defendant.**

**No. 94 C 1029.**

United States District Court,
N.D. Illinois,
Eastern Division.

March 10, 1995.

Rebecca E. Zietlow, Legal Assistance Foundation of Chicago, Chicago, IL, for Major Cunningham.

Craig Arthur Oswald, U.S. Attys. Office, Chicago, IL, for Donna Shalala.

## MEMORANDUM OPINION
## AND ORDER

CASTILLO, District Judge.

Pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), Major Cunningham ("Cunning-

ham") appeals the final decision of the Department of Health and Human Services Secretary Donna Shalala ("Secretary") denying his applications for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* and denying his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* Both parties move for summary judgment under Federal Rule of Civil Procedure 56.

## BACKGROUND

Cunningham is a 52 year old[1] male who claims that he became disabled on December 15, 1990[2] due to a back problem and weakness in his left leg. (R. 90, 94) He ended his employment as an assembly line worker with Sara Lee on December 15, 1990, when the company relocated its plant to South Carolina. (R. 45, 47, 56) Some of Cunningham's alleged physical problems appear to date back to a car accident in 1975 or 1976, sometime after which his neck began to bother him. (R. 56–59) On February 22, 1977, Cunningham was admitted to Cook County Hospital where he underwent two surgeries: an anterior cervical fusion with Kiel bone, C5–6 and discectomy C4–5; and, shortly thereafter, an anterior cervical fusion with iliac bone graft, C4–5. (R. 132) Cunningham's final diagnoses were: (1) cervical spondylosis; (2) C5–6 myelopathy by compression; and (3) wound infection. (R. 132) Cunningham also suffers from back pain, which became severe in the fall of 1988. (R. 59–61) On December 21, 1988, Cunningham was again admitted to Cook County Hospital where he underwent a micro-discectomy at L5–S1. (R. 148) His pre- and post-operative diagnosis was a herniated disc at L5–S1. (*Id.*)

Cunningham applied for a period of disability and disability benefits on December 20, 1991 (R. 90–93) and applied for supplemental security income on November 22, 1991. (R. 94–97) Both applications were denied initially and on reconsideration. (R. 98–101, 103–05, 106–08) Cunningham requested a hearing before an administrative law judge, which was held on May 20, 1993. Following Cunningham's hearing, Administrative Law Judge Richard F. Sprague ("the ALJ") issued a written decision on September 16, 1993, denying Cunningham's applications for DIB and SSI. (R. 20–27) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied review on December 22, 1993. (R. 2–3) This action commenced when Cunningham filed a complaint for judicial review, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), on February 18, 1994. The Court now turns to a consideration of the record in this case to determine whether the ALJ's decision is substantially supported by the record.

### Cunningham's Testimony

Cunningham, represented by counsel, testified in his own behalf at the hearing before the ALJ. He stated that he completed school in Alabama through the ninth grade and that he has had no vocational or specialized job training.[3] (R. 43–44) Cunningham is divorced and has three children—two by his former wife and a third by another woman. (R. 41) He lives in a 19th floor apartment with his 25 year-old daughter. (R. 42) Presently he has no income, his daughter pays for everything; although, he does receive food stamps. (R. 44)

Cunningham worked for Sara Lee as a "Group Leader" in the bakery. (R. 45) In that capacity, he served as a fill-in person on a bakery assembly line, ensuring that everything was running properly and filling assorted positions as needed. (R. 45–46). The assembly line to which he was assigned involved five different positions and Cunningham filled each of them at various times. All

---

1. Cunningham does not have a birth certificate, but at the administrative hearing he testified that his family's bible contains an annotation marking February 13, 1943, as his birth date.

2. At the administrative hearing, Cunningham effectively amended his alleged onset date to February 13, 1993—his fiftieth birthday. (R. 83–84).

3. In response to an inquiry by the ALJ, Cunningham indicated that he could read and write "[s]o, so." (R. 44) When asked if he could read the newspaper or similar materials, Cunningham replied that he could do so "somewhat", but that he could not read some words. (*Id.*) Cunningham testified that his writing is "okay" but stated that he would need help to write a letter. (*Id.*).

of the positions required Cunningham to be on his feet moving around and lifting various amounts of weight. (R. 49–53) Cunningham's employment with Sara Lee ended when the company relocated its operations to South Carolina in December of 1990. (R. 56) Thereafter, Cunningham collected unemployment for approximately one year while looking for work.[4] (R. 56)

Cunningham recounted that he was hospitalized twice for surgery. (R. 57) The first hospitalization, which was for neck surgery, was in 1977.[5] At that time, Cunningham was in the hospital for approximately three weeks and was in therapy for six months. (R. 58) He was out of work for six months. (*Id.*) Cunningham's second hospitalization—for back surgery—was in 1988. (R. 60) Following his second surgery, Cunningham was out of work for approximately two months. (R. 61) When he returned to work he was given light assignments for another two months. (*Id.*)

Cunningham testified[6] that he suffers every day from varying degrees of pain in his back and left leg. (R. 68–69) He described the pain as a throbbing pain, originating in the lower back, radiating into his hips and buttocks, down his left leg, and into his calf. (R. 70) His pain is severe most of the time and has gotten worse over the last couple of years. (R. 70–71) The pain is aggravated if he attempts to lift anything. (R. 71) Cunningham frequently wakes up at night because of the pain. (R. 74)

Although Cunningham is able to take care of his personal needs—such as washing, shaving, grooming and dressing—his daughter, with whom he lives, does all the housework, cooking, laundry and shopping. (R. 74–75) He testified that he can only walk "about a block" before he "start[s] losing [his] balance and then stumbling and dragging [his] left leg." (R. 77) Climbing stairs also gives him trouble if there is nothing for him to hold on to. (R. 79) However, he has not needed a cane or other assistive device for walking. (R. 71) He can spend only 35–45 minutes on his feet at one time without experiencing severe problems. (R. 77) Also, he is only able to sit for approximately 30–45 minutes without experiencing severe problems. (R. 78) Also, it is difficult for Cunningham to get up after sitting; it takes him a while to get "stretched out." (R. 77) Cunningham is unable to lift any amount of weight while stooping or squatting, and can lift about 5 to 10 pounds off a table. (R. 78–79) Cunningham stated that he drives approximately once per week (R. 43), and that he can take public transportation by himself. (R. 79) Cunningham does not do much socially; he does not go to restaurants or shows (R. 75), but he occasionally goes to his brother's house to visit. (R. 76) When he does go to his brother's house, he is either picked up by his brother or driven by his daughter. (*Id.*) He also has a woman friend whom he has been seeing for a couple of years that he sees on weekends. (*Id.*) Occasionally, Cunningham babysits for friends in the building in which he lives. (R. 72) He has no hobbies and belongs to no clubs. (R. 73) He attends church occasionally. (*Id.*)

Cunningham began to see a Dr. Russell for his back pain approximately two years before the hearing. (R. 66) Although Cunningham indicated that for a while he was seeing Dr. Russell "pretty regular[ly]", he stated that he saw Dr. Russell only three or four times in the last year (R. 66), and he estimated that he had seen a doctor a total of five times since he stopped working. (R. 68) Cunning-

4. Although Cunningham testified that he was looking for work after his employment with Sara Lee ended, he also testified that he could no longer have performed his prior work as of the day that his job at Sara Lee ended because his back condition was deteriorating. (R. 56–57).

5. When asked whether his neck problems that necessitated the surgery in 1977 were the result of an accident or injury, Cunningham mentioned that he had been in an accident in 1975 or 1976; however, Cunningham did not explicitly link his neck problems to his accident. (R. 58–59).

6. Hereinafter, for ease of exposition in the following summary of Cunningham's testimony, the Court shall, for the most part, dispense with the use of qualifying expressions such as "Cunningham stated", "Cunningham testified", and "Cunningham reported". Nevertheless, it should be understood that the Court is merely recounting Cunningham's testimony here, not stating findings of fact.

ham stated that he does not have the money to see a doctor on a regular basis. (R. 67) When asked what the doctor does for him, Cunningham replied that he prescribes pain pills. (R. 66) Upon further inquiry, Cunningham stated that he has taken prescription Motrin occasionally over the past year. (R. 66–67) The last time Cunningham took medication was approximately one month before the hearing. (R. 67)

*The Vocational Expert's Testimony*

Vocational Expert ("VE") Frank R. Mendrick testified at Cunningham's hearing; he was present in the hearing room throughout Cunningham's testimony. (R. 80–83) Mendrick classified Cunningham's previous employment with Sara Lee as semi-skilled with a medium level of exertion, involving lifting a maximum of 35 pounds on occasion. (R. 82) Mendrick opined that Cunningham has no readily transferable skills to the sedentary range or to the sit and stand option range of employment. (*Id.*) In response to the following question by the ALJ, "[Cunningham's] best, as far as lighter activity would be medium basically?", Mendrick responded, "That's correct, sir." (R. 83) In addition, Mendrick replied affirmatively when the ALJ asked whether there were a number of jobs for a claimant "if the claimant had the ability to perform sit or stand action jobs, with no lifting over 10 pounds." [7] (*Id.*)

*Cunningham's Medical Records*

1. *Dr. Russell's Spinal Disorders Report*

On January 21, 1992, Cunningham's treating physician, Dr. Russell, completed a "Spinal Disorders" report form at the request of the Illinois Bureau of Disability Determination Services in connection with Cunningham's application for benefits. (R. 152–53) Cunningham was seen by Russell on that date. Russell diagnosed Cunningham as suffering from lumbar radiculopathy and dated the onset of Cunningham's back problems to his surgeries in 1977 and 1988. (R. 152) Russell reported that Cunningham complained of pain in the lumbosacral area, that

there was no sensory loss, that Cunningham exhibited hyper-reflexive reflexes (with greater hyper-reflexivity in the left lower extremities than in the right); that there was no muscle wasting (*i.e.,* atrophy); and that Cunningham ambulates without assistance. (*Id.*) No abnormalities of gait were noted. (*Id.*) Russell reported that Cunningham's straight leg raising was positive at 60° on the left and 70° on the right. (R. 153) Cunningham had full range of motion in the cervical spine with no paravertebral muscle spasm. With respect to the lumbosacral spine, Cunningham's range of motion for flexion was full (90°) but extension was restricted to 15° (normal = 30°) and paravertebral muscle spasms were present. (*Id.*) Under abnormalities of lateral flexion, Russell noted that Cunningham's lateral flexion was 30° (normal flexion in degrees is not indicated). In response to an item inquiring as to Cunningham's ability to do work related activities, Russell stated, "He may be able to perform sedentary work." (*Id.*) Russell noted that he did not have access to Cunningham's x-rays or other old records. (R. 152)

2. *Dr. Kim's Residual Functional Capacity Assessment*

On January 31, 1992, Dr. Young–Ja Kim, M.D., completed a "Residual Physical Functional Capacity Assessment" of Cunningham in connection with his application for benefits. (R. 154–161) In his assessment of Cunningham's exertional limitations, Kim indicates that Cunningham can occasionally lift and/or carry 10 pounds, frequently lift and/or carry less then 10 pounds, and is not further limited in his ability to push and/or pull. (R. 155) Further, Kim indicates that Cunningham can stand and/or walk for a total of at least 2 hours in an 8–hour workday and can sit for about 6 hours in an 8–hour workday. (*Id.*) With respect to postural limitations, Kim indicated that Cunningham cannot climb rope or scaffolds but was otherwise capable of frequently crawling, crouching, kneeling,

---

7. At this point in the VE's testimony, his testimony was discontinued after Cunningham's counsel argued that if Cunningham had no transferrable skills, was over fifty, and was restricted to sedentary work, then the pertinent regulations would direct a finding of disability. On the other hand, counsel conceded that if Cunningham were found to be capable of light work, then he would not be considered disabled. (R. 83–84).

545

stooping, balancing, and climbing ramps, stairs or ladders. (R. 156) Kim noted no manipulative, visual, communicative, or environmental limitations. (R. 157–58) In what appears to be a recounting of Dr. Russell's report[8], Kim also noted Cunningham's complaint of pain in the lower back, that his ambulation is unassisted, that straight leg raising was positive at 60° on the left and 70° on the right, that sensory loss and muscle atrophy were absent, that range of motion of the lumbosacral spine was 90° for flexion and 15° for extension with paravertebral muscle spasms, and that Cunningham's lower extremities exhibited increased reflexivity— with the left side greater than the right. (R. 161)

### 3. *Dr. Trafimow's Consultative Examination Report*

At the hearing, the ALJ recommended that an independent orthopedic exam be conducted. (R. 84) That examination was conducted on June 24, 1993 by Jordon Trafimow, M.D. (R. 168–174) In his evaluation report, Trafimow stated that he had reviewed all reports provided by the Bureau of Disability Determination Services and had spent 30 minutes with Cunningham. (R. 168) Trafimow recounted Cunningham's surgical history, and reported Cunningham's contention that neither surgery had helped him and that his pain was the same as before. (*Id.*) Trafimow recited Cunningham's pain report as follows:

The claimant's current pain starts in the back, just to the left of the midline at about the lumbosacral junction level. There is also pain in the right buttock, radiating down the posterior aspect of the right thigh to the knee, but there is no pain radiating below the knee. The pain is made worse by walking, bending, lifting etc. and made better by rest.

(*Id.*) Trafimow also noted Cunningham's claims that he can walk approximately one block, stand for about thirty minutes, and lift five to ten pounds. (*Id.*) Regarding his orthopedic examination of Cunningham, Traf-

imow reported that Cunningham ambulated without an assistive device and that Cunningham walked back and forth for forty feet in the examination room without any obvious sign of pain or discomfort. (R. 169) Trafimow also noted that Cunningham "had no difficulty sitting in a chair[,] getting out of the chair[, and] climbing onto and off the examining table." (*Id.*) Trafimow reported that Cunningham has full range of motion in his neck; and, with respect to Cunningham's back, Trafimow stated:

Full range of motion without tenderness, muscle spasm or deformity. Straight leg raising is limited on the left to about 30° and on the right to about 30°, in each case limited by reproduction of back pain and not by buttock or leg pain. The patient could bend forward approximately 90°. However, he bent his knees to a considerable degree while doing this. He said that he could not go further because of pain at the insertion of the erector spinae muscles into the sacrum on the left side. Lateral bending was carried out and was restricted by pain at this same location.

(*Id.*) Trafimow's neurological examination of Cunningham revealed:

Excellent strength of toe and ankle dorsiflexors and perineals on the right. On the left, however, when I start to apply counter pressure the claimant stops pulling against me. I can tell this because I would pull on the toes with one hand and feel the tendons with the other. When I started to pull against the claimant's toes the tendons would go slack. When I did the same thing on the normal right side, the flow of strength continued unabated and of course, the tendons stayed taut. The same thing happened when I tested the claimant's perineals on the left side. The hip extensors have excellent strength in both sides. The left hip abductors are weaker than the right, but I cannot be sure that the claimant is actually tightening the muscles. Normal strength of quadriceps bilaterally. Cranial nerves II through XII are normal.

8. There is no indication that Kim conducted his own physical examination whereas the RFC assessment form indicates that "treating or examining source statement(s) regarding the claim-

ant's physical capacities" were in the file reviewed by Kim. (R. 160) Also, Kim's "findings" parallel Russell's exactly. Thus, it would appear that Kim was simply reporting Russell's findings.

The knee and ankle jerk reflexes are definitely hyperactive. I was not able to get a positive Babinski. Sensation is intact to touch, toes point downward.

(R. 170)

Trafimow reported that x-rays of the lumbosacral spine revealed "preservation of normal lumbar lordosis, intervertebral body heights and disc spaces without evidence of subluxation. Visualized para-osseous soft tissues are unremarkable." (*Id.*)

Trafimow found no "problem at all in the left knee. There is no swelling or tenderness and range of motion is full. There is no quadriceps atrophy." (*Id.*)

In offering his diagnostic impressions, Trafimow opined that Cunningham's first surgery was successful because he could not "find any clear weakness on the right side at the present time." Regarding Cunningham's second surgery, Trafimow remarked, "[i]t is not clear that the claimant still has any muscle weakness. Accordingly, I am unable to tell if the second surgery was successful or not." (*Id.*) Trafimow also opined that Cunningham "probably has some mild fibrosis, although I do not think that this is significant enough to explain his pain." (R. 171)

Summarizing his evaluation, Trafimow stated:

> I am not really sure what is causing the claimant's pain. The fact that he does not keep his muscles tight when I examine the left side indicates that to a certain degree there may be an element of failure to cooperate.

(*Id.*)

Trafimow also completed a "Medical Assessment Of Ability To Do Work–Related Activities (Physical)" form on which he indicated that Cunningham's lifting, carrying, standing, walking, and sitting are not affected by his impairment. (R. 173) Similarly, Trafimow indicated that Cunningham's ability to reach, handle, feel, and push or pull, are also not affected by his impairment. (R. 174) Trafimow indicated that Cunningham could occasionally climb, balance, stoop, crouch, kneel, and crawl. (*Id.*) Finally, Trafimow

noted no environmental restrictions for Cunningham. (*Id.*)

### 4. *Cook County Hospital Records*

#### (i) 1988 Hospital Records

Cunningham was admitted to Cook County Hospital on December 21, 1988, complaining of a four month history of pain in his right thigh radiating into his right calf. (R. 145–146) An MRI revealed a herniated nucleus pulposus at L5–S1. (R. 146) Physical examination revealed positive straight leg raising for the right leg at 45°; straight leg raising for the left leg was negative. (*Id.*) Motor function and strength were intact. Cunningham was diagnosed with a "herniated disc L5–S1 right", and underwent a micro-discectomy L5–S1. (R. 148)

#### (ii) 1977 Hospital Records

Cunningham was admitted to Cook County Hospital on February 22, 1977, complaining of progressively worsening weakness and stiffness of the left leg over a period of four years. (R. 132) A myelogram revealed nerve blockage at C6–7 (*Id.*), and physical examination revealed:

> Left leg: Spastic weakness, and deltoid, biceps reflex were within normal limits, but triceps, major pectoralis, knee jerk and ankle jerk were apparently increased bilaterally. Also, Babinski's, Chaddock positive bilaterally. Ankle clonus was positive in both sides.

(*Id.*) Cunningham underwent an anterior cervical fusion with Kiel bone, C5–6 and discectomy C4–5 on February 24, 1977. On March 7, 1977, no neurological change from admission was observed. One week later, on March 16, 1977 [9], Cunningham underwent a second surgical procedure: anterior cervical fusion with iliac bone graft, C4–5. (R. 132) Cunningham's final diagnoses were cervical spondylosis, C5–6; myelopathy by compression; and a wound infection. (*Id.*)

---

**9.** Some of the records indicate that the second procedure was performed on March 16, 1977, while others indicate that the date was March 17, 1977. (R. 132–34).

### 5. Dr. Morgan's Report of Incapacity [10]

On November 10, 1993, Henry L. Morgan, M.D., examined Cunningham and completed an "Illinois Department of Public Aid Report of Incapacity." (R. 9–12) Dr. Morgan noted Cunningham's complaints of severe pain in the left leg and back and a three year history of sciatica. (R. 9) In his report of Cunningham's musculoskeletal system, Dr. Morgan noted "muscle spasm lower back lumbar region over laminectomy scar." (R. 11) Morgan further noted that straight leg raising was positive at 50° on the left, and 70° on the right. (Id.) Morgan also noted "decreased pin prick, hyper-reflexia and clonus left leg." (Id.) However, Dr. Morgan noted that Cunningham's ambulation was normal. (Id.) In his report of Cunningham's neurological system, Morgan noted "peripheral neuropathy left leg with severe sciatica." (R. 12) Assessing Cunningham's capacity for sustained physical activity in light of his physical impairments and medically related subjective limitations, Morgan indicated that Cunningham's capacity for standing, sitting, turning, speaking, finger dexterity in both hands, gross (grasping) manipulations, and fine manipulations remained at full capacity during an 8 hour work day, 5 days a week. (R. 10) Morgan indicated that Cunningham's capacity for walking, stooping, and travel (public conveyance) to be reduced by up to 20%. (Id.) Morgan also indicated that Cunningham's capacity for bending, climbing, pushing, and pulling was reduced by 20 to 50%. (Id.) Additionally, Morgan opined that Cunningham's capacity to perform "physical activities of daily living" was reduced 20 to 50%, and that Cunningham could repeatedly lift up to 10 pounds during an 8 hour day, 5 days per week. (Id.) Morgan indicated that Cunningham suffered no mental impairments. (Id.)

### Other Evidence of Record

On December 20, 1991, Cunningham completed a "Disability Report" for the Social Security Administration. (R. 112–119) [11] In the Disability Report, Cunningham identified his disabling condition as "back problem, [and] weakness left leg." (R. 112) He further stated that his "back is real weak, to the point where I can't get out of bed without assistance." (Id.) Describing his activities, Cunningham stated that his daughter does the cleaning, shopping and cooking; that he engages in no recreational activities; that he visits his brother once every two weeks; and that he drives a car when he is able—"I usually drive 2–3 times a week." (R. 115) In conjunction with completing this report, Cunningham was interviewed by an interviewer from the Social Security Administration. (R. 118–119) The interviewer noted that he or she did not observe Cunningham to have any difficulty with reading, writing, answering, hearing, understanding, using hands, breathing or seeing. (R. 119) However, the interviewer noted that Cunningham had difficulty sitting and walking, noting "Claimant showed difficulty in sitting after a one hour interview he appeared to be in pain[.] Claimant walk[ed] with a limp[.]" (Id.)

On March 23, 1992, in conjunction with filing his application for reconsideration, Cunningham completed a "Reconsideration Disability Report" and was again interviewed by an interviewer from the Social Security Administration. (R. 120–25) In reporting his condition, Cunningham stated, "I have no balance, when walking at times, I'll fall. My back is still paining me." (R. 120) Cunningham also stated that he is afraid to walk long periods because of his falling and that when he sits, he cannot get back up. (Id.) He reported pain when lifting his legs or bending to put on his clothes. (R. 122) The interviewer indicated that he or she did not

---

**10.** Morgan's report was first submitted by Cunningham during his request for review of the ALJ's decision by the Appeals Council. (R. 4) Thus, although technically a part of the administrative record, Morgan's report is not a part of the record upon which the ALJ made his decision. Therefore, the report "cannot be used as a basis for a finding of reversible error." See, *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.1994).

Accordingly, although we summarize Morgan's report, we shall not rely upon it in reaching our determination.

**11.** This report was apparently completed for Cunningham during the course of a personal interview and then he signed it. (R. 49–50, 119).

observe Cunningham to have any difficulty with reading, writing, answering, hearing, speaking, understanding, using hands, breathing, seeing, walking or sitting. (R. 124)

On February 7, 1994, Cunningham underwent an evaluation at Literacy Chicago. Pl.'s Mot.Summ.J., Ex. A (Letter from Literacy Chicago).[12] Cunningham scored 2.2 on the Slosson Oral Reading Test, which indicates that he reads on a second grade level. *Id.*

*The Secretary's Decision*

The Secretary found that "the medical evidence establishes that the claimant has some pain from the results of surgeries to his neck and back, but that he does not have an impairment or combination of impairments listed in, or medically equal to [an impairment as defined by regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1]." (R. 26) Moreover, the Secretary found that "[t]he severity of some of the claimant's complaints are not supported by the medical evidence." (*Id.*) Although the Secretary determined that Cunningham was unable to perform his previous work, she found that Cunningham had the RFC "to perform the physical exertion requirements of work except for lifting over twenty pounds" and "to perform the full range of light work." (*Id.*) The Secretary also found that Cunningham was 50 years old—which, under the regulations constitutes "closely approaching advanced age"—and has a ninth grade education. (*Id.*) Accordingly, taking into consideration Cunningham's RFC, age, and education, the Secretary applied Rule 202.11, 20 C.F.R. Pt. 404, Subpt. P, App. 2, and concluded that "[Cunningham] was not under a 'disability,' as defined in the Social Security Act at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f))." (*Id.*)

In reaching her decision, the Secretary observed that Dr. Trafimow's final opinion was that Cunningham "did not have any significant limitation in [his] abilities to walk, stand, sit, or lift." (R. 25) The Secretary also noted that Dr. Trafimow "found a full range of motion in his back without tender-

ness, muscle spasm or deformity," and found that Cunningham's "straight leg raising was limited to 30 degrees on the left and right because of back pain, but not buttock or leg pain." (*Id.*) The Secretary further noted Dr. Trafimow's observations concerning Cunningham's possible lack of cooperation. (*Id.*) The Secretary reported Dr. Trafimow's finding that Cunningham "probably has some mild fibrosis, but it was not significant enough to explain his pain." (*Id.*)

The Secretary also noted that Dr. Russell's report reported Cunningham's complaints of pain in the lumbosacral area, but revealed no sensory loss or muscle wasting. The Secretary noted Dr. Russell's finding that Cunningham had a positive straight leg raising test. (*Id.*) The Secretary pointed to Dr. Russell's observation that Cunningham's ambulation was unassisted, and Russell's opinion that Cunningham "may be able to perform sedentary work." (*Id.*)

The Secretary relied on the foregoing medical evidence to support her contention that "Cunningham made a fairly good recovery from both of his surgeries, at least as to performing light work." (R. 25) The Secretary also noted that Cunningham returned to his last job after his second surgery, and that he only left work because his company relocated and that even then he actively sought employment and drew unemployment benefits for one year. (*Id.*) Although recognizing that Cunningham's condition may have worsened somewhat after this time, the Secretary remarked, "I do not think it would significantly interfere with the performance of light work. It would only affect the claimant's ability to occasionally lift over twenty pounds." (*Id.*) The Secretary also noted that Cunningham "has not had any regular [medical] treatment in several years, and does not take medications regularly." (*Id.*) In addition, the Secretary stated that she believed that Cunningham "may have exaggerated his limitations." (*Id.*) In minimizing Cunningham's subjective complaints, the Secretary noted that the medical record did not contain any support for Cunningham's

12. There are two exhibits "A" attached to the Plaintiff's Motion for Summary Judgment: (1) Letter from Literacy Chicago; (2) Affidavit of Rebecca E. Zietlow.

allegations that he could "only walk a block because of dragging his left leg and losing his balance," and that his ability to stand, sit and lift was severely limited. (R. 25–26) In particular, the Secretary observed that Dr. Trafimow "found no such limitations, and noted the possible failure to cooperate by the claimant during the examination." (R. 26) The Secretary then remarked, "It would be the heavier type work activities that would bring on the severe pain, and render him unable to perform such things, and not the light work as defined by the Regulations." (*Id.*)

*Statutory and Regulatory Framework* [13]

█ The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir.1993); *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir.1993). A claimant is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The Social Security Regulations outline a five-step inquiry to be followed when determining whether a claimant is disabled: (1) is the claimant presently unemployed; (2) is the claimant's impairment or combination of impairments severe; (3) does the impairment meet or exceed any of the list of specific impairments that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; (4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and (5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. 20 C.F.R. § 404.1520; *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir.1993); *Shields v. Sullivan*, 801 F.Supp. 151, 155 (N.D.Ill.1992). "A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Shields*, 801 F.Supp. at 155. Upon reaching the fifth step, the rules in the Medical Vocational Guidelines of Regulation Pt. 404, Subpt. P, App. 2 (the "Grid") must be considered. *Id.* The Grid rules incorporate an analysis of the vocational factors of age, education, and work experience in combination with the claimant's RFC—defined in Social Security Ruling 83–10 as "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)." "RFC is expressed in terms of a claimant's maximum sustained work capability for either 'sedentary,' 'light,' 'medium,' 'heavy' or 'very heavy' work as those terms are defined by Reg. § 404.1567." *Shields*, 801 F.Supp. at 155. In determining if work is available for the claimant in the national economy, the ALJ may use a VE (Reg. § 404.1566(e)), and if work is available, then a finding of not disabled must result. Reg. §§ 404.1520(f)(1), .1566(b).

*Standard of Review*

Section 205(g) of the Act provides that a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Act further provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Luna*, 22

---

13. The standards for establishing disability under Titles II (DIB) and XVI (SSI) of the Act are the same. *Kapusta v. Sullivan*, 900 F.2d 94, 95 n. 5

(7th Cir.1989). Therefore, for ease of exposition, the Court will treat Cunningham's application simply as one for disability benefits.

F.3d at 689 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). "Substantial evidence may be something less than the greater weight or preponderance of the evidence." *Young v. Secretary of Health & Human Servs.,* 957 F.2d 386, 389 (7th Cir.1992). Also, "a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion." *Shields,* 801 F.Supp. at 157 (citing *Delgado v. Bowen,* 782 F.2d 79, 83 (7th Cir.1986) (per curiam)). Thus, a reviewing court will not "reevaluate the facts, reweigh the evidence or substitute [its] own judgment for that of the Secretary." *Luna,* 22 F.3d at 689.

In discussing the degree to which an ALJ must articulate his or her reasoning, the Seventh Circuit has observed that while the ALJ "must minimally articulate his or her justification for rejecting or accepting specific evidence of disability ... he or she need not provide a written evaluation of every piece of evidence that is presented." *Steward v. Bowen,* 858 F.2d 1295 (7th Cir.1988); *see also Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985) ("We require only 'a minimum level of articulation by the ALJ as to his assessment of the evidence.'" quoting *Zalewski v. Heckler,* 760 F.2d 160, 166 (7th Cir.1985)). And, in *Brown v. Bowen,* 847 F.2d 342, 346 (7th Cir.1988), the court noted, "It is enough if the ALJ indicates the path of decision.... The administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course may be discerned." *See also Stephens,* 766 F.2d at 287 ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.")

### ANALYSIS

Cunningham presents two principal arguments to this Court on review: (1) The Secretary's decision that he is capable of performing light work is not supported by substantial evidence and is contrary to the law because, *inter alia,* the Secretary disregarded most of the evidence in the record and based her decision on isolated remarks in Dr. Trafimow's report, disregarding Cunningham's testimony about his pain and functional limitations; and, (2) His case should be remanded to the Secretary to allow consideration of evidence first presented to this Court indicating that Cunningham may be functionally illiterate.[14] Pl.'s Mem.Supp.Mot. Summ.J. at 1, 4–11, 12–14.

*Cunningham's Capacity to Perform Light Work*

■ Cunningham's first argument—that the Secretary's determination that Cunningham can perform the full range of light work is not supported by substantial evidence— cannot be sustained. In support of this argument, Cunningham contends that the Secretary's decision was based solely on "isolated comments in Dr. Trafimow's report," and Dr. Trafimow's conclusion that Cunningham did not exhibit functional limitations. *Id.* at 7. In the same vein, Cunningham argues that the Secretary inappropriately dismissed evidence including: Dr. Russell's opinion that Cunningham 'may be able to do sedentary work'; Dr. Kim's findings concerning Cunningham's ability to lift, stand, walk, and sit; Dr. Trafimow's statement that Cunningham is limited in forward and lateral bending, and that his straight leg raising is limited; and the evidence of Cunningham's back surgeries. *Id.* at 6–7. Cunningham highlights that the Secretary did not even mention Dr. Kim's report, and argues that Dr. Russell's report—that of the treating physician— should have been given more weight. *Id.* at 7. Moreover, Cunningham attempts to impugn Dr. Trafimow's suggestion that he failed to cooperate during his examination by pointing out that this suggestion was based solely on the fact that Cunningham's toes and tendons went slack when pressure was applied to his left leg. *Id.* at 6–7. Cunningham also argues that the Secretary failed to make the requisite credibility determination when she summarily rejected Cunningham's testimony about his pain and functional limi-

---

**14.** Cunningham has attached to his motion for summary judgment a report from Literacy Chicago (the "Literacy Chicago Report" stating, "The results of the Slosson Oral Reading Test places him at 2.2. This means that he is reading on a second grade level."

tations despite the fact that Cunningham's testimony is supported by evidence of record. *Id.* at 9. In conclusion, Cunningham contends that the medical evidence, combined with his testimony, shows that he is capable, at most, of performing sedentary work. *Id.* at 11–12.

■ At this point, it is worthwhile—at the risk of being repetitive—to reiterate some of the standards that guide this Court's review. At the outset, it must be borne in mind that "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens,* 766 F.2d at 287. While the Secretary "must mention and discuss, however briefly, *uncontradicted* evidence that supports the claim for benefits," she is not required " 'to evaluate in writing every piece of testimony and evidence submitted.' " *Stephens,* 766 F.2d at 287 (quoting *Zalewski,* 760 F.2d at 166) (emphasis added).[15] The Secretary is also permitted to chose between evidence offered by the claimant's attending physician and that offered by a consulting physician, subject only to the limitation that his choice is supported by substantial evidence. *Id.* at 288–89. Similarly, the Secretary is also not bound by a finding made by a physician regarding a claimant's RFC.

■ In light of the foregoing standards, it becomes clear that Cunningham's arguments cannot be sustained. First, the Secretary was not required to explicitly mention Dr. Kim's report in view of the fact that it was contradicted by Dr. Trafimow's findings. Also, notwithstanding Cunningham's suggestion to the contrary, the Court cannot conclude that the Secretary simply relied on isolated evidence from Dr. Trafimow's report: Again, it is not incumbent upon the Secretary to specifically comment upon every bit of evidence in the record. Moreover, upon its own review of the record, the Court finds that Trafimow's limited findings indicating functional restrictions do not compel the conclusion that the Secretary's decision finding Cunningham capable of performing light work is not substantially supported. Also, Cunningham's suggestion that the Secretary ignored evidence of his two surgeries is also without merit. The Secretary addressed both of Cunningham's surgeries in her decision, but found, based on the medical evidence, the fact that Cunningham eventually returned to work after his second surgery, and the fact that Cunningham sought work after his company relocated, that Cunningham made a good recovery from his surgeries. (R. 25)

■ Again, notwithstanding Cunningham's suggestion to the contrary, the Secretary was not necessarily obliged to give Dr. Russell's report greater weight because of his status as Cunningham's treating physician. *See Stephens,* 766 F.2d at 288–89. And, *Micus v. Bowen,* 979 F.2d 602 (7th Cir.1992), is not to the contrary. *Micus* clearly recognized that the treating physician's opinion is not "the final word on a claimant's disability." *Id.* at 608–09. *Micus* teaches that the weight to be given the treating physician's opinion is a function of many factual considerations including the importance of the treating physician's opportunity to have observed the claimant over a long period of time. In the instant case, Cunningham had seen Russell over the period of only two years and in that time he saw Russell approximately five times. It is hardly a foregone conclusion that Russell's limited extent of contact with Cunningham—albeit greater than Trafimow's—requires that his opinion be afforded greater weight. We note further that none of Russell's chart reports were made a part of the record and hence it is impossible to ascertain the extent of Russell's familiarity with Cunningham. Indeed, when asked what Russell did for Cunningham, he merely replied that Russell gives him prescription pain pills. (R. 66) In view of the facts of this case, this Court cannot conclude that the ALJ erred in giving more weight to Trafimow's report than to Russell's and this

---

**15.** Although the Secretary is not legally required to explicitly pass judgment on every piece of evidence, this Court believes that the better practice is to briefly address all the evidence militating in favor of a finding of disability and relied upon by the disability applicant since it is almost inevitable that the decision of the Secretary will be appealed to the federal district court.

Court will not substitute its own beliefs about the proper weight to be given to these two physician's reports for those of the ALJ. We find that the ALJ's reliance on Trafimow's evaluation of Cunningham was reasonable and that Trafimow's evaluation provides substantial support for the Secretary's determination that Cunningham is capable of performing the full range of light work.

 Finally, we note briefly that it is clear from the ALJ's narrative that he discounted Cunningham's subjective complaints as incredible. It is evident to this Court that the ALJ relied on a variety of considerations including Trafimow's findings suggesting lack of cooperation, lack of corroboration for some of Cunningham's claims (*e.g.*, dragging his left leg and losing his balance, severe limitations in his ability to stand, sit, and lift), and the fact that Cunningham did not regularly take medication, in reaching his conclusion that Cunningham "may have been exaggerating his limitations." (R. 25) Because the ALJ sufficiently indicated the path of his reasoning and because he ALJ's narrative sufficiently indicated that he found Cunningham's testimony exaggerated, this Court will not reverse simply because the ALJ failed to include a specific credibility finding in his statement of findings. Further, insofar as Cunningham may wish for this Court to upset the Secretary's credibility determination, he misapprehends the Court's limited role on review. In recognition of the fact that the ALJ is in the best position to observe the claimant, credibility determinations have been traditionally left to the ALJ. *Clark v. Sullivan*, 891 F.2d 175, 178 (7th Cir.1989). Moreover, the ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record.'" *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989) (citing *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986)).

 To the extent that Cunningham suggest that the ALJ did not adequately explore his subjective complaints of pain, we cannot agree. Where a claimant's subjective allegations of pain are not sufficiently corroborated by the objective medical evidence, S.S.R. 88–13 requires the Secretary to consider "the nature and intensity of [the] claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities." *Luna*, 22 F.3d at 691. The ALJ adequately considered Cunningham's complaints of pain in light of the foregoing criteria. The ALJ inquired about the nature, frequency and location of Cunningham's pain, and about activities that make the pain worse. Moreover, the ALJ explored Cunningham's daily activities, and asked about his ability to lift things. The ALJ also asked Cunningham about his use of medication to alleviate his pain and about how frequently he sees a doctor. As discussed above, in the end, the ALJ found Cunningham's testimony regarding his nonexertional limitations to be incredible and this Court will not upset that finding.

In the final analysis, Cunningham's arguments ultimately ask this Court to do little more than reweigh the evidence and make different credibility determinations, substituting our judgment for that of the ALJ. This we cannot do. After thoroughly reviewing the record in this case, the Court finds the Secretary's finding that Cunningham is capable of performing the full range of light work to be substantially supported by the record.

*Cunningham's Literacy*

In support of his second argument, Cunningham contends that the report from Literacy Chicago, which he submits for the first time to this court, indicating that he reads at only a second grade level, is new and material evidence, and that he can show good cause for having not submitted it previously. Pl.'s Mem.Supp.Mot.Summ.J. at 13. Therefore, Cunningham argues, the Court should remand this case for further administrative proceedings so that this evidence may be considered by the Secretary in determining his disability. *Id.* at 12–13. Cunningham argues that this evidence is material because it would compel a finding that he is disabled even if the Secretary's determination that he is capable of performing light work is upheld, and contends that he has good cause for not submitting the evidence earlier because: (1) he did not previously realize that his illitera-

cy was germane to the outcome of his case; (2) his current attorney did not learn of his illiteracy—and the literacy report did not come into existence—until after the Appeals Council denied his request for reconsideration. *Id.* at 13–14. The Secretary opposes Cunningham's remand motion contending that Cunningham has failed to show that the evidence is material or that he had good cause for failing to present this evidence previously.

"A court may remand a case to the Secretary to consider additional evidence if the evidence is new, material and there is good cause for not introducing it during the administrative proceeding. 42 U.S.C. § 405(g)." *Sears v. Bowen,* 840 F.2d 394, 399 (7th Cir.1987). " 'New' evidence is evidence 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Sample v. Shalala,* 999 F.2d 1138, 1144 (7th Cir.1993) (quoting *Sullivan v. Finkelstein,* 496 U.S. 617, 626, 110 S.Ct. 2658, 2664, 110 L.Ed.2d 563 (1990)); *see also Sears,* 840 F.2d at 399 (finding evidence not in existence at the time of the hearing "new"). "Evidence is material if there is a reasonable possibility that it would have changed the outcome of the Secretary's determination." *Sears,* 840 F.2d at 400. "Good cause" admits of no easy definition and must be evaluated on a case by case basis.

The Secretary does not contend that the Literacy Chicago report is not "new" evidence; rather, the Secretary challenges the materiality of the evidence and whether Cunningham has established good cause for failing to adduce evidence of his illiteracy earlier. We address these arguments in turn.

The Secretary contends that the Literacy Chicago Report is not material because "[u]nder the regulations, a person is illiterate when he cannot read or write a simple message. 20 C.F.R. § 404.1564(b)(1) (1993). [And, t]his evidence does not demonstrate an inability to read or write a simple message." Def.'s Mem. at 14. The Secretary also suggests that certain evidence in the record indicates that Cunningham's reading level was above "quite low" standard set by the regulations. *Glenn v. Secretary of Health &*

*Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987). In particular, the Secretary notes that: (1) "Plaintiff testified that his ability to read was 'okay' (Tr. 43–44)." Def.'s Mem. at 15; (2) The claims representative that took plaintiff's disability report indicated that she observed no difficulty in reading or writing; (3) Plaintiff was able to write the time of machine breakdowns at his bakery job and he read gauges, production sheets, and employee sheets.

The Secretary's contentions that the Literacy Chicago Report does not *demonstrate* an inability to read or write simple messages and that Cunningham has cited no authority to *demonstrate* that a second grade reading level constitutes illiteracy, are misplaced. The materiality requirement does not require that the new evidence would, as a matter of certainty, compel a different determination by the Secretary. It requires only a "reasonable possibility" that the Secretary would have reached a different outcome. *Sears,* 840 F.2d at 400. It is certainly reasonably possible that a second grade reading level falls below the literacy level established by the regulations. It appears to be undisputed that if Cunningham were found to be illiterate by the Secretary, a finding of disabled would be required under the regulations even if he is capable of performing light work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.09.

The Court is also unpersuaded by the Secretary's argument that the evidence of record indicates that Cunningham's reading level is above the regulation's threshold literacy level. In the first place, the Secretary mischaracterizes the record in stating "Plaintiff testified that his ability to read was 'okay' (Tr. 43–44)." Def.'s Mem. at 15. Indeed, the hearing transcript reads as follows:

Q. Did you learn how to read and write okay?

A. (No audible response)

Q. So, so?

A. Yeah.

Q. Can you read the newspaper, things like that?

A. Somewhat. Some, some words I can't.

Q. How about writing, what can you write?

A. The writing is okay.

Q. You could write a letter to someone out of town, things like that?

A. With help. I know what I want to say.

Q. Well, can you write it though.

A. I might have to have my daughter to dictate it.

(R. 44). Plainly, Cunningham did not testify that he could read "okay." Instead, he gave no audible response to the question and responded affirmatively to the prompt, "so, so?" Without further exploration of the issue, it is impossible to ascertain from this testimony whether Cunningham's reading level is above the regulatory threshold. With respect to the Secretary's statement that the claims representative "observed no difficulty" in plaintiff's reading and writing, it need only be noted that there is no indication that the claims representative had any meaningful opportunity to observe Cunningham read or write. Finally, although Cunningham included such tasks as "check production sheet for product that was going to run," "check employee sheet to find out how many people were there," and "check the ovens to make sure all heat controls are set" in describing his job duties for the disability report (R. 116), it is far from clear that these tasks required "reading" in any meaningful sense—all of these tasks could have involved graphical or numerical displays. Indeed, when asked if his job required any reading, Cunningham replied, "no." (R. 56) And, the only writing Cunningham was required to do was to write down the time that a machine was down. (R. 55)

This Court's review of the record does not reveal any evidence establishing that Cunningham's reading level was above the minimum level established by the regulations. For all of the forgoing reasons, the Court finds that the Literacy Chicago Report meets the materiality requirement for remand.

█ The issue of whether Cunningham has established "good cause" for failing to present evidence of his illiteracy earlier in these proceedings gives the Court some pause but we believe that Cunningham has met his burden in this regard. It is, of course, undisputed that the Literacy Chicago Report did not come into existence until after the Appeals Council issued its decision; hence, Cunningham could not have presented the report any earlier. *Cf. Sears*, 840 F.2d at 399 (finding that the claimant demonstrated good cause for including a report in the record where the report did not exist until after the Appeals Council denied his claim).

Although he admits, in his memorandum submitted to this Court, that he knew he was illiterate at the time of the administrative hearing, Cunningham maintains that he did not know that his illiteracy was a relevant factor in his disability determination. And, there is no evidence in the record that the attorney representing Cunningham during the administrative hearing had any knowledge of Cunningham's illiteracy. Furthermore, common sense suggests that Cunningham would not readily volunteer the fact that he is illiterate unless compelled to do so. Indeed, Cunningham's present counsel, who represented him before the Appeals Counsel but not during the administrative hearing, attested that she had no knowledge of Cunningham's illiteracy until after the Appeals Council issued its decision. In light of all of the foregoing considerations, the Court finds that Cunningham has established good cause for failing to submit evidence of his illiteracy previously.

Because the evidence of illiteracy that Cunningham seeks to have the Secretary consider is new and material and because he has established good cause for failing to present this evidence earlier, he is entitled to have his case remanded to the Secretary in order to allow the Secretary to consider the evidence of illiteracy in making her disability determination.

## CONCLUSION

For all of the foregoing reasons, plaintiff Major Cunningham's motion for summary judgment [15–1] is denied, Cunningham's motion for remand [15–2] is granted, and the Secretary of Health and Human Services

Donna Shalala's motion for summary judgment [22–1] is denied.