Robert D. HALBROOK, Plaintiff,

v.

Shirley S. CHATER, Commissioner of the
Social Security Administration,
Defendant.

No. 95 C 5131.

United States District Court,
N.D. Illinois,
Eastern Division.

April 26, 1996.

Barry Alan Schultz, Schultz & Winick, Chicago, IL, for plaintiff.

Brian R. Havey and Kathryn Ann Kelly, United States Attorney's Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

 Pursuant to 42 U.S.C. § 405(g), Robert D. Halbrook appeals the final decision of the Commissioner of Social Security, Shirley S. Chater, denying Halbrook's application for Supplemental Security Income ("SSI") under §§ 1602 and 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 1381a and 1382c(a)(3)(A). The plaintiff moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

### RELEVANT FACTS

The Court begins with a broad overview of the facts, and then reviews Halbrook's claims in detail. Halbrook is a 41 year old man who alleges that he has been continuously disabled since March 1, 1993, due to a chronic fatigue disorder. R. 44. Halbrook has a high school education and four years of technical training as a Machinist.[2] R. 99. He has a full-scale IQ of 105, which indicates that he is generally functioning in the average range. R. 164.

---

1. We note that, although the plaintiff has moved for summary judgment, we do not apply the familiar summary judgment standard of "genuine issue of material fact" employed under Rule 56 of the Federal Rules of Civil Procedure. When a district court reviews an individual social security case, the court's review is limited to a determination of whether the record contains substantial evidence to support the agency's decision, and whether the agency applied the proper legal standards. *See Hamilton v. Secretary of Health and Human Servs.*, 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring); *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir.1992). Essentially, we treat Halbrook's motion for summary judgment as a motion for an order reversing the Commissioner's decision. *See Garcia v. Califano*, 463 F.Supp. 1098, 1100–01 (N.D.Ill.1979).

2. Halbrook attended the Madison Area Technical College from September of 1987 through the spring of 1992. R. 89, 249. In that time period, he missed two semesters: the first semester of the 1988–89 school year and the first semester of the 1989–90 school year. R. 170. He has a two year diploma in machine tool techniques. R. 249.

Halbrook applied for SSI on August 6, 1993, claiming "chronic fatigue disorder" as his impairment.[3] R. 44, 48. Although not mentioned on his application for SSI, Halbrook also suffers from hypertension, obesity, and muscle spasms around the top of his cervical spine. R. 218, 238. While the SSI application notes a March 1, 1993 "onset of impairment date," R. 44, Halbrook claims to have been suffering from "debilitating" fatigue since February 1988, when he fell and hit his head on some ice. R. 70, 253. Ever since that time, Halbrook reports extreme difficulty staying awake, particularly after exerting himself. R. 184, 189, 201, 252, 255. He complains of being in a "mental fog" all the time. R. 184. He reported to one doctor that as a result of his impairments, he lost "another" job. Id.

One doctor has diagnosed Halbrook as having chronic fatigue of "unclear etiology." R. 184. However, this diagnosis was unsupported by "discernible physical findings." R. 206, 218. Several doctors have concluded that his episodes of "falling asleep" are most consistent with dissociative episodes rather than loss of consciousness. R. 166, 192, 212. Halbrook has had several psychiatric evaluations, which rule out depression but diagnose a narcissistic personality disorder. R. 212, 217. A chiropractor treating Halbrook for muscle spasms around his neck diagnosed Halbrook with mild hypertrophic spurring in the cervical spine, and hypertrophic spurring along the lumbar spine. R. 238. Halbrook's pain improves with diversified adjusting. R. 237–38.

Halbrook's SSI claim was denied on February 18, 1994, R. 49, and denied again on reconsideration on June 20, 1994. R. 53. Following a hearing on September 15, 1994, Administrative Law Judge Ellen K. Thomas ("ALJ") issued a decision denying SSI benefits on October 25, 1994. R. 23. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review. R. 4–5.

■ Halbrook has filed a complaint for judicial review pursuant to 42 U.S.C. § 405(g). The Court now considers the record in this case to determine whether the ALJ's decision is "both supported by substantial evidence and based on the proper legal criteria." *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir.1992).

*Halbrook's Testimony*

At the administrative hearing Halbrook testified that he was 40 years old, married, with two children. R. 248–49. He has a two-year diploma from Madison Area Technical College in machine tool techniques. R. 249. His family lives on public aid and the SSI that his son receives. R. 251.

Halbrook testified that he has chronic fatigue syndrome, which causes him to sleep extreme amounts of time—from eight hours per day to three days at a time. R. 252, 255–56, 258. The amount of time he sleeps correlates with the level of exertion he maintains, R. 255, so that a 5– or 3–day per week work schedule could put him in bed for 1–3 days. R. 258. In July 1994, he had to leave his last job after five weeks because he started having muscle spasms that paralyzed his right arm. R. 250. He described feeling so tired the last week he worked that after sleeping the weekend, he was unable to get out of bed for work on Monday and had to stay in bed for five days. R. 252, 256. Prior to that he worked for about five weeks in the fall of 1992 as a tool and die machinist. R. 251. He claims that he was fired because he could not stay awake on the job and "maintain an alert mental state." Id.

Halbrook testified that he has been diagnosed with sleep apnea. R. 255. He stated that the doctor treating him had told him that a breathing machine could work to alleviate the problem, but the only thing that would "positively work" would be a "tube being placed here on a respirator and [that would] be a permanent implant...." Id. He also jammed his neck on a short doorway in 1988 and has had to receive chiropractic therapy ever since. R. 254. He testified

**3.** Halbrook applied by telephone on March 26, 1993, but he failed to sign and return the form until August 1993. R. 48. As a result, he was not given a protective filing date of March 1, 1993, but of August 26, 1993. *Id.*

that when the top bone in his neck "gets out" he has increased fatigue. R. 253–54. Halbrook also described recurring sinus problems, and high blood pressure which is now under control. R. 256–57. He has had psychiatric evaluations which did not show depression. R. 257.

His problems with fatigue became particularly troublesome in the winter of 1988 after hitting his head on ice. R. 252–53. Describing himself as a "workaholic" prior to the 1988 accident, Halbrook testified that he worked as a mechanic and a salesman from 1978 to February 1988. R. 258. However, he did not make enough money to file income taxes between 1982 and 1991. *Id.*

His daily activities consist of eating, riding his lawn mower or working in his workshop for about one to two hours. R. 260–261. He does no household chores. R. 268–69. He drives when accompanied by another person. R. 267. He can write without difficulty, but falls asleep after reading a few paragraphs. R. 269. He can no longer play his trumpet or play computer games. R. 259. In addition, he has leg cramps and spasms which restrict the amount of time he can spend on his feet. R. 262–63. He can stand for about 1–2 hours before he begins getting mentally confused or gets leg spasms, at which point he must sit for about 2 hours. R. 264.

*Halbrook's Medical Records*

A. *Neck and Back Muscle Spasms*

Dr. Rodney Stanfield of the Stanfield Chiropractic Center treated Halbrook between February and October 1994. R. 237–38. Halbrook came in complaining of neck and lower back pain, mid-back and right sided scapular discomfort, with a loss of feeling in his right upper extremity. R. 238. The lumbar and cervical spine MRI series showed "some mild hypertrophic spurring" in the cervical spine as well as "some hypertrophic spurring" in the lumbar spine region. *Id.* On examining Halbrook, Dr. Stanfield also noted paravertebral muscular spasm in his right trapezius and cervical spine, "some mild location of malpositioning" and restricted range of motion in the lower lumbar spine, and some mild range of motion loss on the cervical spine. *Id.* Otherwise, Halbrook appeared to be "a healthy, middle-aged man." *Id.* Dr. Stanfield treated him chiropractically with diversified adjusting. *Id.*

Halbrook saw Dr. Stanfield at least once per month, each time receiving diversified adjusting. R. 237–38. Halbrook continued to complain of pain in his cervical spine which improved with treatment but returned to the paresthesia state in between treatments. *Id.* The records indicate that Halbrook was much improved after the diversified adjusting treatment, and his range of motion improved by at least 70%. R. 237. Dr. Stanfield regularly recommended that Halbrook take vitamin supplements, eat a good diet and get some exercise in response to the excessive fatigue. R. 237–38.

In June and July 1994, Dr. Kendall Stephens, Halbrook's primary treating physician, R. 253, found a fair amount of spasm and trigger point tenderness in the mid-portion of Halbrook's trapezius. R. 234. He prescribed Oruvail and gave Halbrook an injection of Kenalog and Marcaine without epinephrine. *Id.* On a later visit, Dr. Stephens noted that the pain in Halbrook's upper shoulder resolved after the trigger point injection. *Id.*

B. *Sleep Disorder, Neurological and Psychological Evaluations*

Several doctors from Dean Medical Center treated Halbrook from February 1988 through September 1993. Dr. Icenogle treated Halbrook on February 1, 1988 when he came into the Dean Urgent Care Center with pain on the right side of his head. R. 204. Halbrook did not remember a 30 minute period of time, but thought he may have slipped on some ice. *Id.* Dr. Icenogle diagnosed a possible concussion. R. 205.

In April 1988, Halbrook described his episodes of falling asleep to Dr. David Hahn of Dean Medical Center: the "episodes usually [begin] with drowsiness and then uncontrolled sleepiness and then periods of amnesia. For example he once drove 300 miles and had no recollection of it." R. 202. Dr. Hahn noted that Halbrook possibly sustained a concussion two months earlier. *Id.* Dr. Hahn diagnosed amnesic spells of uncertain

etiology, and recommended a neurology consultation. *Id.*

Dr. Mary Dominski, also of the Dean Medical Center, treated Halbrook from April through June 1988. R. 199–202. Halbrook originally saw Dr. Dominski in April 1988, when he came in complaining of uncontrollable lethargy. R. 201. Since February when he hit his head on some ice, he described having several episodes of "falling asleep," in which he could not remember blocks of time lasting several hours. *Id.* Dr. Dominski opined that he was having dissociative episodes, and wanted to rule out post concussion syndrome. *Id.* She recommended an EEG, multiple sleep latency tests, and a neuropsychological evaluation. *Id.*

In May 1988, Dr. Dominski conducted a multiple sleep latency test. R. 163. The results were "strongly against the occurrence of narcolepsy since no rapid onset of REM is seen. During the only nap opportunity that culminated in sleep, normal progression into stage one and stage two sleep occurred." *Id.* Dr. Dominski concluded that the test results were normal. *Id.* In June 1988, Halbrook continued to complain of daytime sleepiness, but was no longer having dissociative episodes. R. 199. Halbrook asked Dr. Dominski for a written excuse saying why he was unable to work or go to school. *Id.* She explained that she would need to further evaluate his dissociative episodes with a psychiatric evaluation. *Id.*

Dr. P. Williamson examined Halbrook in May 1988, running a complete battery of neuropsychological tests "to rule out an organic etiology for his current difficulties," and evaluating Halbrook for disturbances of memory and consciousness at the request of Dr. Dominski. R. 164. The evaluation revealed an IQ of 105, which "indicates that he is generally functioning in the average range." *Id.* His cognitive testing scores were "compatible with his age, level of education, and occupation." R. 167. Dr. Williamson diagnosed a possible conversion disorder with dissociative features, R. 166, and indicated a concern from a neuropsychological standpoint that Halbrook's "slurred speech, poor fine motor control, and impulsivity and difficulties with verbal learning on

the California Verbal Learning Test" could indicate some type of organic dysfunction. R. 167. At that time, however, he felt that "evidence for any extensive organic dysfunction is simply not there." *Id.* He concluded by suggesting a psychiatric referral if "there is no other compelling evidence of organic brain dysfunction." *Id.*

Dr. Benton treated Halbrook at Dean Medical Center from August 1989 through April 1991. R. 193–199. Over the course of three visits, Halbrook complained of excessive sleepiness, R. 195, 197, 199, including that he would fall asleep while reading or playing video games. R. 199. In August 1989, Dr. Benton recommended sleep studies to rule out narcolepsy. *Id.* In October 1989, Dr. Benton noted the possibility that Halbrook would be thrown out of school and would have to obtain full-time employment. R. 195. He opined that Halbrook was "incapable of handling this at this point in time." *Id.* Suspecting depression and suppressed violence, Dr. Benton screened Halbrook with the Center for Epidemiologic Studies Depression ("CESD") scale, and the Zung Self-rating Depression Scale ("SDS"), both of which generated normal scores. *Id.* Dr. Benton prescribed Calan for the hypertension and noted a desire to give Halbrook Ritalin for depression, but admitted that he did not have a diagnosis to justify such a prescription. *Id.*

In January 1992, Halbrook saw Dr. Olson, complaining of excessive hypersomnolence for the past 15 years and episodes where he "falls asleep." R. 192. Dr. Olson opined that these episodes sound more like dissociative experiences than actual sleep. *Id.* Dr. Olson suggested that vasomotor rhinitis might be partly causing his chronic fatigue, and prescribed Prednisone. R. 190.

Dr. Balin, who treated Halbrook at Dean Medical Center from August 1992 through September 1993, R. 181–188, opined to Dr. Chan from the Social Security Administration that Halbrook probably had chronic fatigue of unknown etiology. R. 206. He opined that Halbrook was "functionally disabled" due to the chronic fatigue, personality problems, depression, and lack of motivation. *Id.* He stated that Halbrook had difficulty

keeping a job, but he could not identify the underlying problem. *Id.* Dr. Balin recommended a psychiatric evaluation to determine if Halbrook could work eight hours per day. R. 207. In April 1993, Dr. Balin diagnosed poorly controlled hypertension, and chronic fatigue of unclear etiology. R. 184. He prescribed Lopressor and recommended sleep apnea studies. *Id.*

In May 1993, Dr. Lotz performed a neurological examination on Halbrook, apparently in response to a request by Dr. Balin. R. 174–75. Dr. Lotz opined that while Halbrook appeared sleepy, his cognitive functioning was normal, his cranial nerves showed no abnormalities, and his motor, sensory, and coordination tests were normal. R. 174. Dr. Lotz ran a battery of blood tests which revealed a normal full blood count, normal liver function tests, normal thyroid function tests, and normal kidney function tests. *Id.* Ultimately, he diagnosed Halbrook with chronic muscle fatigue syndrome, but he explained to Halbrook that he found no evidence of a muscle, nerve, or neuromuscular transmission defect. *Id.* Dr. Lotz suggested that Halbrook's fatigue had a central cause and recommended a psychiatric evaluation for depression. *Id.* He also recommended sleep apnea studies. R. 174–75.

Dr. Steven Weber of the University of Wisconsin Sleep Disorders Laboratory conducted a sleep study on Halbrook in June 1993. Dr. Weber prepared a Nocturnal Polysomnogram Report in which he described abnormal distributions and proportions of sleep stages which were characterized by hundreds of brief arousals. R. 171. He recorded 318 episodes of obstructive sleep apnea accompanied by severe hypoxemia. *Id.* In addition, he noted 62 episodes of ECG activation accompanied by EEG signs of arousal, most of which occurred in association with episodes of apnea. *Id.*

Dr. Skatrud added to Dr. Weber's report, stating that numerous episodes of obstructive sleep apnea was consistent with sleep apnea syndrome. *Id.* He recommended a repeat sleep study to titrate a nasal Continuous Positive Airway Pressure ("CPAP") device. *Id.* The records that follow do not mention any follow up studies.

Dr. Michael Caldwell, a psychologist, examined Halbrook on November 16, 1993 at the request of the Social Security Disability Insurance program. R. 210. Halbrook exhibited "no indications of hallucinations, delusions, loose associations, or other indications of psychotic mentation. His affect throughout the examination was somewhat exaggerated and theatrical and reflected a level of emotional intensity that was somewhat inappropriate." R. 211. Dr. Caldwell warned that this personality could give the impression that Halbrook was presenting his symptoms for gain. R. 212.

Halbrook described episodes of falling asleep "in which he would carry out activities which he would not recall later" which, according to Dr. Caldwell, had a dissociative quality. R. 211. "His description of his 'falling asleep' episodes is most consistent with a dissociative phenomena . . . [which] does not appear to reflect a multiple personality disorder or fugue state. He clearly does have an atypical dissociative process occurring. This may reflect some form of mental disorder or may be the result of sleep deprivation due to a severe sleep disorder." R. 212. Dr. Caldwell's examination was negative for depression, but he did diagnose a "dissociative disorder not otherwise specified" and "Narcissistic personality features." *Id.*

Halbrook began seeing Dr. Kendall Stephens as his primary physician in February 1994 after moving from Wisconsin to Vandalia, Illinois. R. 218. Dr. Stephens noted that Halbrook had been evaluated for chronic fatigue and a sleep disorder, which appeared to make him "more or less, dysfunctional." *Id.* Dr. Stephens opined that the diagnosis of chronic muscle fatigue syndrome was not supported by "discernible physical findings or positive tests," *id.*, and noted that "pin pointing a specific cause for his current symptoms of chronic fatigue and lack of energy [has] eluded [the] medical establishment." R. 219. Dr. Stephens indicated that Halbrook suffered from hypertension, which was by then "relatively well controlled" with Acupril. R. 219, 235. Finally, Dr. Stephens opined that Halbrook may suffer from an atypical depressive disorder, but recom-

mended another psychological evaluation. R. 218–19. In March 1994, Halbrook reported that his sleeping pattern "seems to be correcting itself, i.e. sleeping at night not during the day." R. 235. In May, Halbrook reported that he continued to have some irregularities in his sleep, but that he was sleeping better. *Id.*

Dr. Gandhy examined Halbrook on April 20, 1994 and reviewed Dr. Caldwell's report regarding Halbrook. R. 214. The mental status exam revealed that Halbrook's "thought processes were within normal limits. No auditory or visual hallucinations. No paranoid ideations.... His motor activity is within normal limits.... He is intellectually average.... His sensorium is clear. He is oriented to 3 spheres." R. 215–16. She diagnosed him as having a "Personality Disorder, Narcissistic" and wanted to "rule out Hypersomnia with Sleep Studies." R. 217.

### Vocational Expert's Testimony

In response to a hypothetical by the ALJ as to what work could be performed by an individual of the same age, education, and work experience as Halbrook, who has no exertional limitations except that he cannot operate hazardous machinery, work at heights, and can only meet minimal social demands, vocational expert Bachman Schumacher stated that such an individual could not return to his past work, but that he could perform a variety of other jobs. R. 275–76. For example, he could work as a set-up man, perform small engine repair, or work as a telephone order clerk, mail clerk, or in catalog sales. R. 276. Schumacher estimated that between 4,900 and 5,000 of these jobs exist in the region. *Id.*

### APPLICABLE STANDARDS

#### Statutory and Regulatory Framework

Under Title XVI of the Social Security Act, a disabled person is eligible for SSI benefits if that person meets certain requirements pertaining to income. 42 U.S.C. § 1381a (1995). The Act defines "disabled" as "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months...." *Id.* § 1382c(a)(3)(A). A "physical or mental impairment" is further defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(C). A claimant is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* § 1382c(a)(3)(B).

Social Security regulations outline a five-step inquiry to be followed when determining whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment or combination of impairments severe? (3) Does the impairment meet or exceed any of the list of specific impairments that the Secretary acknowledges to be so severe as to preclude substantial gainful activity? (4) If the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his former occupation? and (5) If the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his age, education and work experience? *See Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993); 20 C.F.R. § 404.1520.

"An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir.1985) (citation omitted). Upon reaching the fifth step, the rules in the Medical Vocational Guidelines of regulation part 404, subpart P, appendix 2 (the "Grid") must be considered. *Id.* The Grid incorporates a claimant's age,

education, and work experience as well as the claimant's residual functional capacity ("RFC") to determine what work the individual is able to perform. *Id.* "RFC is expressed in terms of a claimant's maximum sustained work capacity for either 'sedentary,' 'light,' 'medium,' 'heavy,' or 'very heavy' work as those terms are defined by 20 C.F.R. § 404.1567." *Id.* In determining if work is available for the claimant in the national economy, the ALJ may use a vocational expert. 20 C.F.R. § 404.1566(e). If work that the Grid suggests the claimant is able to perform is available, then a finding of not disabled must result. *See* 20 C.F.R. § 404.1566(b).

*Standard of Review*

■ Section 405(g) of the Social Security Act provides that a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In considering the appeal, "the findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* Thus, the function of the reviewing court is to determine whether the ALJ's decision is supported by substantial evidence. Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir.1994) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). A reviewing court will not "re-evaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Secretary." *Id.*

## ANALYSIS

The ALJ determined that Halbrook has a narcissistic personality disorder, hypertension, and obesity. R. 22. She found, however, that he has no condition or combination of conditions which meets or equals in severity a condition listed in Appendix I. R. 23. Halbrook contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to consider significant

medical evidence of muscle spasms causing paresthesia and sleep apnea. Halbrook further contends that the ALJ failed properly to credit his mental impairments given the diagnosis of sleep apnea. Finally, Halbrook argues that the ALJ's credibility findings were patently wrong on the record and were based on improper inferences.

■ At the outset, we begin with the general principle that the ALJ is not required "to evaluate in writing every piece of testimony and evidence submitted." *Zalewski v. Heckler,* 760 F.2d 160, 166 (7th Cir. 1985). Instead, we require only "a minimal level of articulation by the ALJ as to [her] assessment of the evidence." *Id.* Thus, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985).

■ "A court must examine the entire record of the proceedings to determine whether there is 'substantial evidence' for the decision." *Id.* at 288. For the reasons set forth more fully below, the Court finds that the ALJ's decision is substantially supported by the evidence in the record.

*Muscle Spasms Causing Paresthesia and Sleep Apnea*

■ Halbrook contends that the ALJ completely ignored substantial evidence that he suffers from muscle spasms causing paresthesia and sleep apnea. Specifically, Halbrook argues that the ALJ ignored evidence that muscle spasms in the trapezius muscle cause Halbrook's excessive sleep patterns, loss of strength in his right arm with paresthesia, and weakness and numbness. The ALJ noted Halbrook's claim that he has neck problems that negatively affect his eyesight, speech, and balance, but she did not agree with his assertions that the problems rose to the level of severity required by the SSI regulations. R. 17.

■ We begin by re-articulating the standard for assessing a disability. "[A] claimant is not guaranteed disability benefits merely because [he] suffers from a medically verifia-

ble impairment. A claimant also must show that, due to [his] impairment, [he] is precluded from engaging in any substantial gainful activity within the entire national economy." *Oliveras v. Shalala*, 870 F.Supp. 411, 414 (D.Mass.1994) (citing *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S.Ct. 2287, 2291–92, 96 L.Ed.2d 119 (1987)).

Drs. Stanfield and Stephens have both treated Halbrook for discomfort in his neck and back. R. 234, 237–38. Dr. Stanfield provided the most extensive evaluation and treatment of Halbrook. In addition to performing physical examinations, Dr. Stanfield ordered and evaluated lumbar and cervical spine series. R. 238. Dr. Stanfield found mild spurring in the cervical spine, some spurring in the lumbar area, spasms in the neck and right shoulder, mild back discomfort, and a mild limitation of motion. *Id.* He stated that Halbrook's disc spaces were well developed and maintained, and there were no fractures, subluxation, or dislocation noted. *Id.*

Medical records indicate that Halbrook's neck and back problems, diagnosed as mild to begin with, improved with treatment and medication. Dr. Stanfield noted that while Halbrook's paresthesia in his right upper extremity returns "during the month or so in between his treatments," regular chiropractic treatment appears to alleviate the problem. *Id.* Dr. Stanfield also reported a 70% improvement in the originally mild limitation in Halbrook's range of motion five months after beginning chiropractic treatment. R. 237–38. Halbrook himself told Dr. Stanfield that discomfort in his arm, lower back, and right upper extremities had improved with treatment. *Id.* In addition, Dr. Stephens reported that a single trigger point injection in Halbrook's trapezius resolved his pain and muscle spasms. R. 234. Neither Dr. Stanfield nor Dr. Stephens indicated that the muscle spasms affected Halbrook's ability to lift objects or work generally. In fact, Dr. Stanfield repeatedly recommended that Halbrook exercise and stretch and encouraged him to work. R. 237. Finally, no physician has described a link between Halbrook's muscle spasms and his sleepiness.

In light of medical evidence that his condition is mild and improves with treatment and medication, and that no doctors have listed any functional restrictions, Halbrook has failed to show that his muscle spasms preclude him from "engaging in substantial gainful activity." *Oliveras*, 870 F.Supp. at 414. Thus, we find that substantial evidence supports the ALJ's determination that Halbrook is not disabled as a result of his muscle spasms.

█ Halbrook next contends that the ALJ improperly ignored evidence that he suffers from sleep apnea. In response, the Commissioner points out that the ALJ specifically took Halbrook's sleep disorder into consideration in her hypothetical to the vocational expert, stating that Halbrook should not be considered for jobs that would require him to operate hazardous machinery or work at heights unprotected. R. 23, 275. Halbrook maintains, however, that the ALJ never specifically addressed medical evidence indicating that he suffers from sleep apnea. Because the ALJ only mentions "drowsiness" in her opinion, R. 18, Halbrook argues that she "never assessed the severity and functional limitations of the sleep apnea."

We reiterate that the ALJ is not required "to evaluate in writing every piece of testimony and evidence submitted." *Zalewski*, 760 F.2d at 166. Despite the ALJ's failure to mention Halbrook's sleep apnea by name, it is clear that she did in fact consider the evidence regarding sleep apnea, as she noted that she had specifically reviewed the disability standards that might apply to such a condition. R. 17 (ALJ reviewed § 3.02, related to chronic respiratory insufficiency, and § 3.10, concerned with sleep-related breathing disorders). In addition, we find that the record supports the ALJ's conclusion that Halbrook's condition did not meet the standards for a disability.

In order to determine whether the ALJ's decision is supported by substantial evidence, we must first determine the standards that the ALJ should have applied in evaluating Halbrook's claim of sleep apnea. Social Security regulations provide that:

Medical signs and laboratory findings, established by medically acceptable clinical

or laboratory diagnosis techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.

20 C.F.R. § 404.1529(b) (1996). To evaluate the persistence of symptoms and the extent to which the symptoms limit an individual's capacity for work, the ALJ should consider objective medical evidence and other evidence, including the individual's work history, daily activities, the intensity of the symptoms, precipitating and aggravating factors, effectiveness of medication or other treatment, and functional limitations. *Id.* at § 404.1529(c). The June 1993 Nocturnal Polysomnogram Report indicates that Halbrook experiences sleep apnea. R. 171. After considering the factors listed in 20 C.F.R. § 404.1529(c), however, we conclude that the evidence adduced from the record substantially supports the ALJ's finding that Halbrook's sleep disorder imposes only slight limitations on his ability to work.

First, Halbrook's educational and work history indicates that he was able to continue attending school and obtain a degree as a machinist despite his complaints of excessive fatigue. R. 168–70. He claims to have been suffering from extreme fatigue for over 20 years,[4] but also states that the fatigue only became debilitating in February 1988, when he hit his head on some ice. R. 70, 253. Even after hitting his head on the ice, he went on to complete at least three more semesters of school at the Madison Area Technical College, earning his diploma as a Machinist. R. 170. Halbrook's vocational instructor, Mr. Garber, opined in February 1992[5] that Halbrook's academic and other performances were not affected by any physical impairments, and that he had good work habits and a normal ability to accomplish work assignments. R. 168–69. Garber observed that Halbrook had "skills and capabilities adequate for this occupation." *Id.*

Second, the ALJ noted that Halbrook's daily activities are inconsistent with the claim that he is incapable of working due to the sleep disorder. R. 19. In August 1993, he listed his daily and weekly activities as driving (up to two hours with a companion), doing car repair, going fishing for 2–4 hours about two times per week in good weather, playing computer games for two hours, watching television for four hours, and attending church two hours twice per week. R. 82. His wife generally confirmed this report in October 1993,[6] and added that he also visits relatives, talks on the phone, and fixes things. R. 105. Halbrook's daily activities do not corroborate his claim of uncontrollable fatigue. *See Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir.1994) (claimant's ability to drive, prepare coffee, perform odd jobs, and go fishing so long as he doesn't sit for more than one hour supported that ALJ's determinations that claimant could work).

Third, the ALJ also considered aggravating factors. R. 20. Medical evidence indicates that Halbrook suffers from hypertension, obesity, and muscle spasms. R. 197, 218, 238. But while it is clear that he has health problems, it is not apparent from the medical records that these problems aggravate the sleep apnea. The hypertension is under control with medication, R. 218–19, and the muscle spasms are controlled with chiropractic treatment, R. 237. No medical evidence suggests that either ailment requires medication or treatment that aggravates his sleep problem. Compare *Sullivan*

4. Halbrook has offered two different accounts of his general sleepiness. Most often, Halbrook explains that he has suffered from fatigue since being discharged from the Air Force in 1974. R. 210. Halbrook has also stated that he has suffered from such fatigue since about age 11 or 12. R. 202.

5. Halbrook contends that Garber's report is irrelevant because he is alleging a disability since November 1992, nine months after Garber's evaluation. We find Halbrook's contention unpersuasive because there is no evidence to indicate that his condition deteriorated or changed at all between February and November 1992.

6. Mrs. Halbrook directly contradicted Halbrook's claim of attending church. R. 105. In response to a question as to how often Halbrook attended church, she answered "never" and wrote: "church we belonged to broke up a few years ago, haven't been comfortable any place else yet." *Id.*

*v. Shalala,* No. 93 C 4737, 1994 WL 457226 (N.D.Ill. Aug. 19, 1994), in which the claimant suffered from virtually identical problems— sleep apnea, hypertension and chest pains, obesity, and musculoskeletal pains. That court noted that while these ailments produced discomfort and limited the claimant's efficiency, the claimant retained his residual functional capacity. *Id.* at *3. Based on the record, the ALJ here was entitled to find likewise.

Fourth, the ALJ considered the fact that Halbrook has not received any treatment to control the sleep apnea. R. 19. This may indicate that the apnea is not especially severe, since Halbrook has not pursued the potential remedies for it. *See Luna,* 22 F.3d at 691 (the ALJ could conclude that claimant's pain was not severe enough to prevent him from working, partly because claimant's complaints of pain were not consistent with his minimal reliance on pain medication). Individuals are required to follow treatment prescribed by their physicians if the treatment can restore the individual's ability to work. 20 C.F.R. § 404.1530(a) (1996). In *Nelson v. Sullivan,* 966 F.2d 363, 367 (8th Cir.1992), a case involving sleep apnea, the Eighth Circuit upheld the ALJ's decision to deny benefits in part because the record showed that the plaintiff's sleep apnea was controllable but the plaintiff had failed to avail himself of the treatment.

Here, after performing the sleep studies, Dr. Skatrud recommended a repeat sleep study to titrate a nasal CPAP to relieve Halbrook's sleep apnea, R. 171, and Halbrook admitted in his testimony that a doctor informed him that a breathing machine (CPAP) could work to alleviate the problem, although results were not guaranteed. R. 55. There is no evidence in the record that Halbrook has pursued this potential remedy, nor is there any indication as to why he did not. The ALJ properly took Halbrook's apparent lack of interest in pursuing a remedy for his condition into account when evaluat-

ing his claim of disability. *See Nelson,* 966 F.2d at 367.

▪ Finally, while many doctors have noted Halbrook's complaints of excessive fatigue, none have suggested that the sleep apnea imposes functional restrictions. For example, there is no evidence that any doctor has told him to stop driving, to stay away from hazardous working conditions, or to nap occasionally throughout the day. Rather, at least one doctor, Dr. Stanfield, encouraged him to work and repeatedly recommended exercise. R. 237. In light of all of this evidence, we find that the ALJ adequately considered the full extent of Halbrook's sleep disorder in determining his lack of disability.[7]

### Effects of Mental Impairments

Halbrook's next claim is that the ALJ failed to credit properly the mental impairments he suffers, particularly in light of the sleep apnea diagnosis. First, Halbrook argues that the ALJ did not consider the effects of the narcissistic personality disorder. As there is no indication of what those effects might be, either in the medical records or in Halbrook's testimony, we are unable to evaluate this argument. Second, though he does not mention it explicitly, Halbrook appears to contest the ALJ's failure to address Dr. Balin's opinion that he is "functionally disabled" due to chronic fatigue, personality problems, depression, and lack of motivation.

The Commissioner argues that the ALJ's decision is supported by the psychological evaluations of Dr. Williamson, Dr. Gandhy, and Dr. Caldwell. Dr. Williamson's examination in May 1988 indicated that Halbrook was "generally functioning in the average range" in terms of intelligence, and noted that there is no "compelling evidence of organic brain dysfunction." R. 167. Drs. Caldwell and Gandhy both diagnosed a "narcissistic personality" feature or disorder. R. 212, 217. No doctor indicated any functional restric-

7. Our holding here does not diminish our previous statement that "[a]lthough the [ALJ] is not legally required to explicitly pass judgment on every piece of evidence, this Court believes that the better practice is to briefly address all the evidence militating in favor of a finding of dis- ability and relied on by the applicant since it is almost inevitable that the decision ... will be appealed to the federal district court." *Cunningham v. Shalala,* 880 F.Supp. 537, 551 n. 15 (N.D.Ill.1995).

tions on Halbrook's ability to work as a result of any psychological problems.

■ The court will not disturb the ALJ's credibility findings unless they are "patently wrong in view of the cold record." *Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).

First, the ALJ properly considered Halbrook's narcissistic personality disorder. Halbrook's narcissistic personality disorder manifests itself in his presentation, which is likely to be exaggerated or theatrical. R. 212. No doctors allege any other effects of the narcissism, nor does Halbrook himself allege any other effects, debilitating or otherwise, of the narcissistic personality disorder. The ALJ took note of Halbrook's personality disorder in instructing the vocational expert to consider the jobs available to a person who could only meet "minimal social demands." R. 275.

■ Second, the ALJ's decision to give more weight to the psychiatric reports of Drs. Williamson, Caldwell, and Gandhy than to Dr. Balin's opinion of Halbrook as "functionally disabled" is supported by the record. First, Dr. Balin is not a psychiatrist. Dr. Caldwell, a psychologist, and Dr. Gandhy, a psychiatrist, contradicted Dr. Balin's impression that Halbrook suffers from depression. R. 212. Second, Dr. Balin admitted that Halbrook's chronic fatigue is of "unclear etiology" and that he did not know why Halbrook has difficulty maintaining a job. R. 206–07. Third, Dr. Stephens noted that Dr. Balin's finding of chronic fatigue was "a rather nebulous diagnosis and he had no discernible physical findings or positive tests to validate this diagnosis." R. 218. The ALJ has the discretion to make determinations when conflicting evidence is presented. *Herr v. Sullivan,* 912 F.2d 178, 181 n. 4 (7th Cir.1990). Here, her decision to give greater weight to the opinions of Drs. Caldwell, Williamson and Gandhy than to Dr. Balin in assessing the extent of Halbrook's mental problems is supported by the record.

## Credibility Findings

■ Finally, Halbrook contends that the ALJ made credibility findings that were patently wrong on the record and based on improper inferences. In particular, Halbrook argues that the ALJ disbelieved his limitations because he presented his problems of chronic fatigue in a histrionic and melodramatic fashion—a manifestation of his narcissistic personality disorder. The Commissioner responds that simply because Halbrook has a disorder which causes him to exaggerate his symptoms does not require the ALJ to believe everything he says.

■ We reiterate that the standard for assessing an ALJ's credibility determinations is high. "We will not disturb a credibility finding unless it is 'patently wrong in view of the cold record.'" *Pope v. Shalala,* 998 F.2d 473, 487 (7th Cir.1993) (quoting *Imani v. Heckler,* 797 F.2d at 512). We note that some of the bases the ALJ articulated for assessing Halbrook's testimony as "not worthy of belief," R. 23, were improper. The ALJ was persuaded that because Halbrook and his family live on public aid and his son's SSI payments, Halbrook has no intention of working and his testimony was "calculated to secure benefits." R. 18, 20. She believed his "entire presentation was a sham" because the SSI benefits would be higher than anything he has ever earned while working. R. 20. In general, a claimant's economic condition should not guide an ALJ's credibility determination—such a practice would create an unfair presumption against indigent claimants. *See Carpentier v. Sullivan,* 755 F.Supp. 816, 820 (C.D.Ill.1990) ("[e]conomic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits" under 20 C.F.R. §§ 494.1566, 416.966).

Nevertheless, we need not overturn the ALJ's credibility determinations for two reasons. First, we have already found that her determinations as to the muscle spasms and sleep apnea are substantially supported by the record. Second, no other medical evidence supports a finding that Halbrook is disabled. Even if the ALJ had believed Halbrook's testimony, she still would have been

bound to deny SSI benefits. Under Social Security regulations, a finding of disability must be predicated on a "medically determinable impairment," shown through medical or laboratory findings, that "could reasonably be expected to produce" the claimant's disabling symptoms. 20 C.F.R. § 404.1529(b).

The medical evidence simply does not support a finding that Halbrook suffers from chronic fatigue syndrome, or any other disabling condition. As we discussed earlier, the only doctor who has diagnosed him with chronic fatigue did not support his conclusion with objective medical evidence or "discernible physical findings." R. 218. Halbrook himself told Dr. Stephens in March and May 1994 that his sleep problems seemed to be improving. R. 235. While Halbrook complained at the hearing that he suffers from leg spasms that keep him from standing more than one hour at a time, R. 262–264, the record, including medical reports, is void of any other mention of leg discomfort or pain. We have already discussed Halbrook's back and neck muscle spasms. Aside from these complaints, Dr. Stephens reported in April 1994 that Halbrook's "true positive pathology to date consists primarily of hypertension, which now appears to be relatively well controlled." R. 219. Thus, the ALJ's credibility determinations, even if misguided, are not "patently wrong in view of the cold record." *Imani*, 797 F.2d at 512.

## CONCLUSION

Because the record does not contain medical evidence of a disability as required by the Social Security regulations, we find that the ALJ's determination was supported by substantial evidence. Accordingly, we deny the plaintiff's motion for summary judgment and affirm the decision below.[8]

---

**8.** This is a "sentence four" determination and hence a final order. *See Melkonyan v. Sullivan,* 501 U.S. 89, 98–102, 111 S.Ct. 2157, 2163–65, 115 L.Ed.2d 78 (1991).